[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-10725

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 19, 2004
THOMAS K. KAHN
CLERK

D.C. Docket No. 01-00251-CR-J-25-TEM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GEORGE CHANDLER, JEROME PEARL,
KEVIN J. WHITFIELD, JOHN HENDERSON,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(July 19, 2004)**

Before DUBINA and HILL, Circuit Judges, and OWENS[*], District Judge.

_____

[*] Honorable Wilbur D. Owens, Jr., United States District Judge for the Middle District of
Georgia, sitting by designation.

HILL, Circuit Judge:

The government charged defendants in the Middle District of Florida with conspiring to commit mail fraud, in violation of 18 U.S.C. § 371. Defendants herein proceeded to trial and were found guilty. Each filed a motion for a judgment of acquittal, which the district court denied. Each appeals that denial.

I.

This trial clearly demonstrates the inherent danger in a multi-defendant conspiracy prosecution – that individuals who are not actually members of the group will be swept into the conspiratorial net. Because the government is permitted broad prosecutorial discretion to prove the conspiracy, the likelihood exists that those who associate with conspirators will be found guilty of a crime that they have not intended to commit, and part of a group that they never joined. *See Dennis v. United States*, 384 U.S. 855, 860 (1966).

This danger is compounded when the grand jury indicts on one theory of the illegal conduct, but the government prosecutes the case on an entirely different theory. This roaming theory of the prosecution can produce trial error of constitutional proportions. *See Russell v. United States*, 369 U.S. 749, 768 (1962) (ill-defined charges leave "the prosecution free to roam at large – to shift its theory

of criminality so as to take advantage of each passing vicissitude of the trial and appeal").

We have seen such conspiracy prosecutions before. In *United States v. Adkinson*, 135 F.3d 1363 (11ᵗʰ Cir. 1998), we reversed convictions obtained by the government upon an indictment that alleged conduct not a crime under the prevailing law. In that case, the district court was persuaded to permit the government to proceed upon the assumption that the controlling law of mail fraud would change prior to the end of trial. *Id.* at 1369. At the close of the government's case, with the law unchanged, the court attempted to cure the defect by redacting the indictment of the allegations not stating a crime, and instructing the jury as to the correct law. *Id.* at 1376. But the damage had been done. The jury had listened to months of testimony from numerous witnesses whose testimony, as it turned out, was both irrelevant and highly prejudicial. *Id.* at 1372. Under these circumstances, we held that fundamental due process was denied the defendants and vacated their convictions. *Id.* at 1374.

Unfortunately, the government in this case once more engaged in this regrettable and unconstitutional series of events.

I.    *Indictment and Pre-Trial Proceedings*

On December 6, 2001, a grand jury empaneled by the United States District Court for the Middle District of Florida, Jacksonville Division, returned a 62 page indictment charging 43 defendants with conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371.[1] The defendants were alleged to have used the United States mails in furtherance of a scheme and artifice to defraud McDonald's Corporation (McDonald's). During the relevant time period, McDonald's conducted "Monopoly" style and "Hatch, Match and Win" promotional games to attract customers to McDonald's restaurants. Over twenty different games were played during this time. The games were played by visiting the restaurant, purchasing food, and collecting the game stamps that were attached to the various food products sold by McDonald's.[2] Certain game stamps were "winners," worth substantial sums of money. McDonald's employed Simon Marketing, Inc. ("Simon") to develop, manage, and advertise the games. Jerome Jacobson was the Director of Security for Simon, with responsibility for disseminating the high-value game stamps.

---

[1] The indictment superceded an earlier one. Some defendants, but not appellants, were also charged with the substantive offense of mail fraud, 18 U.S.C. § 1341.

[2] Game stamps were also available upon written request to McDonald's or in newspaper advertisements.

The indictment alleged that Jacobson would embezzle these game stamps and conspire with friends, relatives, and others to act as "recruiters," who would in turn solicit other friends and relatives to submit the stolen winning game stamps to McDonald's and collect the prize money. Appellants George Chandler, John Henderson, Jerome Pearl and Kevin J. Whitfield were alleged to have recruited winners or redeemed stolen game stamps. Prize money, it was alleged, was shared by Jacobson and the other conspirators. The scope of the alleged conspiracy was substantial, as evidenced by both the number of defendants and the fact that game stamps were distributed nation-wide and so the "winners" were located across the country.[3]

Very early in the pre-trial proceedings,[4] the defendants focused on whether the allegations of the indictment were sufficient to state a crime.[5] Under federal

---

[3] Chandler is from Walhalla, South Carolina, Pearl from Miami, Florida, Whitfield from Savannah, Georgia, and Henderson from Las Vegas, Nevada. The defendants challenged venue and raise the issue again on appeal, but we need not address it as we decide the case on other grounds.

[4] The five defendants filed numerous pre-trial pleadings to which the government responded, but which do not always correspond chronologically to each other. In addition, the parties learned a significant amount of information about each others' cases informally in conversation and by letter. Therefore, to convey a sense of the chronology of the pre-trial developments in the case, we have resorted to synthesizing the various pleadings and responses and summarizing the parties' positions.

[5] Chandler and Pearl filed motions to dismiss. Pearl also filed a motion for particulars, adopted by Chandler.

conspiracy law, the government must allege and prove that the defendants *knowingly* entered into an *agreement* to commit an *unlawful* act. *United States v. Parker*, 839 F.2d 1473 (11th Cir. 1988). The indictment did allege an unlawful act in the embezzlement of the game stamps. Nowhere, however, did the indictment allege that any of these defendants *knew* that the game stamps they redeemed had been stolen. The defendants moved to dismiss the indictment, alleging that it was fatally defective in its failure to allege an essential element of the crime of conspiracy – knowing agreement to commit the illegal act.

The government responded by conceding that the defendants did not know of Jacobson or the underlying theft, but maintained that such knowledge was irrelevant to the defendants' culpability. Articulating its theory of the case, to which it adhered until the final moments of trial, the government asserted that the fraud in this case was the defendants' representation of themselves to McDonald's as "legitimate winners." Since the indictment repeatedly alleges that the defendants "knew" they were not "legitimate" winners of the McDonald's game stamps, the government argued that the indictment was not defective, concluding:

> Therefore, as the fraud in this case was when the "winner" stated that they obtained the game piece *legitimately*, it is absolutely irrelevant whether the fraudulent "winner" knew that the game piece(s) was embezzled from McDonald's/Simon. (emphasis added)

6

In fact, the government represented to the court that it would not make a difference to its case if the defendants had *found their winning game stamps on the street.*[6] So counseled, the court denied the motions to dismiss.

Defendants then filed a motion for a bill of particulars, asking the government to define the terms "legitimate" and "illegitimate" winner as used in the indictment. The defendants asserted that nowhere in the indictment was this term defined so that they had notice why their claims to be legitimate winners were fraudulent.

The government responded that its indictment "clearly and unambiguously" used the terms "legitimate" and "illegitimate" in the context of the McDonald's game rules. These game rules, an example of which was attached to the response as an exhibit, required a winner to state that he had "obtained my potential winning game stamp(s) through *authorized, legitimate channels*" (emphasis added).

In the government's view, there were only three ways to obtain a game stamp through "authorized, legitimate channels" – by purchasing a food item with a winning game stamp attached, by writing to McDonald's and requesting a game

---

[6] The government made this statement in another defendant's plea colloquy before the magistrate judge.

stamp, or by cutting a game stamp out of a magazine or newspaper. Although

conceding that no rule specifically prohibited the transfer of a game stamp from

one person to another, the government contended that the acquisition of a game in

this way would not be through an "authorized, legitimate channel," and, therefore,

any subsequent claim to be a "legitimate" winner would be criminally fraudulent.[7]

The defendants responded by arguing that this theory of the fraud on

McDonald's was flawed in two respects. First, it was based upon a problematic

interpretation of the McDonald's game rules, since those rules do not prohibit

someone from receiving a game stamp from another person prior to application to

McDonald's for the prize. Second, the government's position that defendants'

claims to be legitimate winners constituted the underlying fraud in this case

appeared to charge the defendants with a non-crime – violating the rules of

McDonald's games.

The defendants filed  motions in limine arguing that since the indictment

charged a scheme to embezzle and then fraudulently redeem the game stamps, the

government was required to prove that the defendants *knew* about the underlying

---

[7] The court, in granting defendants' motion for a bill of particulars, noted the importance of defining the term "legitimate" in a criminal prosecution and held that the government's definition was binding upon them.

8

embezzlement. They asked the court to exclude all argument that defendants could be convicted if they did not know of the embezzlement.

The defendants also asked the court to exclude the argument that a transfer of a game stamp was not permitted by the rules, since there was no such prohibition in the published rules. They pointed out that the game stamps were both publically and widely traded on the internet in general and on McDonald's own website. Nonetheless, the court denied the motion.

During the ensuing months and in filed pleadings, the defendants argued that under the law, even if acquisition of a game stamp by transfer from another person violated McDonald's game rules, which they did not concede, it was certainly no crime. The magistrate judge agreed, adopting the well-settled rule that the rules of a private contest are mere offers for a unilateral contract, violation of which either voids or breaches the contract. *Waible v. McDonald's Corp.*, 935 F.2d 924 (8th Cir. 1991).

The government countered that defendants were not charged with violating the rules of McDonald's game. Nevertheless, the government continued to maintain that defendants' representations to McDonald's that they were "legitimate" winners were sufficient to permit conviction for the conspiracy charged in the indictment.

9

Three weeks prior to trial, the government filed its own motion in limine asking the court to prohibit the defendants from arguing at trial that they could not be convicted of the charged conspiracy unless they had knowledge of Jacobson's theft of the game stamps. The government also sought a ruling that the defendants' alleged misrepresentations to McDonald's constituted a fraud sufficient to support their conviction for conspiracy to commit mail fraud. Specifically, the government argued the following:

> It is irrelevant that a conspirator "winner" did not know that the promotional game piece(s) from McDonald's had been embezzled from Simon Marketing, Inc. (Simon) or McDonald's by Jerome Jacobson. The indictment alleges that the defendants conspired to defraud McDonald's by having conspirators falsely claim that they legitimately obtained the winning game piece(s), that is, that they personally obtained the game piece from a food products wrapper, such as a fry box or drink cup from a newspaper insert or periodical, or by requesting a game piece from McDonald's through the mail. The fact is, that all of the "winners" knowingly falsely and fraudulently claimed that they received their winning game piece from one of the three (3) authorized means. Therefore, as the fraud in this case was when the "winner" stated that they obtained the game piece legitimately, it is absolutely irrelevant whether the fraudulent "winner" knew that the game piece(s) was embezzled from McDonald's/Simon.

The government also argued, without citation to law, that "[i]t is an incorrect statement of the law for a defendant to argue that if the violation or breach of the contest rules of a private game is not a state, local or federal crime,

than (sic) the defendants in this case cannot be found guilty of conspiracy to commit mail fraud." Thus counseled, the district court granted the motion in limine precluding the defendants from arguing that knowledge of Jacobson's theft was essential to convict them of the conspiracy.

## II. *The Trial*

The trial commenced on August 12, 2002, and lasted over three weeks. Some 23 witnesses testified, including 14 co-defendants who had already pled guilty to the alleged conspiracy.[8] These co-defendants were asked if they "knew" they were "doing something wrong" and had subsequently plead guilty to the charged conspiracy. Nine of these co-defendants testified that they pled guilty despite the fact that they did not know that the game stamps they redeemed had been embezzled.

Three witnesses from McDonald's and Simon were extensively questioned, over defendants' objection, about the "rules of the game." These witnesses were permitted to testify that, under the rules, there were only three "authorized, legitimate" ways to obtain a game stamp. Since there were over twenty different games[9] played during the relevant time period, over twenty different sets of game

---

[8] One of these co-defendants was Whitfield's aunt, to whom he gave a winning game stamp, given to him by a Jacobson recruiter.

[9] The evidence was that over 50 games were played from 1979 to the time of indictment.

11

rules were admitted into evidence. An audio-visual "blow-up" of one set of rules was published to the jury, over objection. Over two hundred other exhibits were admitted, many regarding these rules. At one point, the court commented that the policy behind the rules was unimportant because "[t]he rules is what's going to control, if anything is going to control."

Defendants continually objected to this testimony, questioning its relevance in the face of the government's assurances that they were not charged with violating the rules of McDonald's games. Defendants argued that, despite these assurances, the trial was proceeding on the theory that violations of the game rules could supply the "illegal activity" at the core of the conspiracy. This, they argued, was the only logical conclusion to be drawn from the government's repeated assertions that defendants' knowledge of the underlying illegal embezzlement was legally irrelevant to their culpability. The court, however, continued to permit the government to proceed in this vein.[10]

---

[10] During these proceedings, the court expressed serious doubt about the charges and the proof on more than one occasion. Midway through Jacobson's testimony, in response to the government's elicitation of co-conspirator hearsay, the court remarked that:

> Well, let me say this. I'm sure that, I am positive that there is not enough evidence of a conspiracy involving these defendants; in fact, there is no evidence of a conspiracy at this point involving these defendants.

Then, at the conclusion of the government's case, defendants moved for judgments of acquittal. They asserted that the government had failed to prove that they agreed to the charged conspiracy – to redeem embezzled game stamps.

The government reiterated its theory of the case – that misrepresentations to McDonald's constituted defendants' criminal fraud in this case, and that defendants conspired with Jacobson to commit this fraud. The government argued:

> And the agreement, and I asked that of these individual winners, when a recruiter gave the game piece to the winner, what was your agreement? Well, with all of those defendants, the agreement is, one, if I'm the winner, I will agree to represent myself as that I have won this. . . . [T]his is a conspiracy. . . . By just their making that agreement . . . that's it. That's all that was necessary in this case.

The court took the motions under advisement overnight, and moved on to the charge conference.

The defendants requested several jury instructions. First, they asked the court to instruct the jury that mere violation of a contract is not a criminal offense. The government agreed that breach of contract does not support a mail fraud conviction. The court agreed to give the instruction.

Next, the defendants requested an instruction that they could not be convicted if they did not know of Jacobson's theft of the game stamps. The

13

government objected, reminding the court of its prior ruling excluding this defense and the court denied the instruction.

Finally, the defendants requested an instruction that receipt of a game stamp from another person, rather than acquiring it in some particular way mentioned in the McDonald's game rules, is not proof of fraud or fraudulent intent. The government agreed this was true, and the court granted the request.[11]

The next morning, five minutes prior to instructing the jury,[12] the court announced that it had "questions" about the government's proof of a single conspiracy. The court stated that it had decided, based upon the evidence and argument, that unless the defendants knew their game stamps had been "embezzled, stolen, or otherwise unlawfully acquired" that they could not be convicted of the conspiracy alleged in the indictment.[13] In an apparent effort to prevent such convictions, the court announced that it had reconsidered and would grant the defendants' requested jury instruction regarding the necessity of proof of

---

[11] The government continued to maintain, however, that defendants' representations to McDonald's that they received their game stamps through authorized, legitimate channels were criminally fraudulent.

[12] The court instructed the jury prior to closing argument.

[13] The court said that without knowledge that the game stamps had been "improperly" acquired that "the issue of a bunch of conspiracies looms more prevalent." We agree. See discussion below at II. B.

14

the defendants' knowledge of Jacobson's embezzlement. The court fashioned the following instruction:

> If you should find that a reasonable doubt exists as to whether a defendant had knowledge that the game stamp he obtained had been embezzled, stolen or otherwise unlawfully acquired, then you must find that defendant not guilty.

The government, having its theory of the case – that such knowledge was irrelevant – totally undone by this instruction, sought a recess. The defendants represent, without government contradiction, that government counsel sought the recess to telephone his office to request permission to dismiss the case. Unfortunately for all, the court refused the recess.

We turn now to our evaluation of these events in the context of defendants' allegations of error.

## II.

The mail fraud statute makes it a crime to "devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . ." 18 U.S.C. §1341. The phrasing of the statute in the disjunctive prohibits two separate unlawful acts, each constituting an independent ground for prosecution. *United States v. Scott*, 701

F.2d 1340, 1343 (11th Cir. 1983). In this case, the government charged a conspiracy to commit both unlawful acts.

First, the indictment charged that defendants conspired to defraud McDonald's. The indictment alleged that Jacobson and the various defendants participated in a scheme in which Jacobson would steal game stamps from McDonald's and the defendants would redeem them and share the prize money with Jacobson. Defendants, then, were charged with having conspired with Jacobson to defraud McDonald's by redeeming stolen game stamps. Since a conspiracy is an agreement to commit an illegal act, it appeared the government would have to prove that the defendants knowingly agreed to redeem stolen game stamps.

The government also charged that defendants conspired to obtain money by false and fraudulent pretenses and representations. The indictment alleged that the defendants falsely represented themselves to McDonald's as "legitimate" winners in order to obtain the prize money.

Thus, the government charged a *single* conspiracy with *two unlawful objects* – to steal the game stamps, and to redeem them by misrepresentations amounting to criminal fraud. Defendants' first allegation of error is that the second of these two objects – the allegedly fraudulent redemptions – either were not unlawful at

16

all, or did not amount to criminal fraud and, therefore, cannot support their conviction.

## A. *The Sufficiency of the Indictment*

### 1. Transfer of Game Stamp as a Violation of the Game Rules

The indictment charges that the defendants' conspired to represent themselves fraudulently as "legitimate winners" when they checked the box on McDonald's prize redemption form to indicate that they obtained their game stamps through "authorized, legitimate channels." Although conceding, that there was no rule that explicitly prohibited the transfer of the game stamps,[14] it was the government's position that the rules affirmatively demanded acquisition of the game stamps through "authorized channels" and that this meant in one of the three ways McDonald's disseminated the game stamps. Since the defendants obtained their game stamps by transfer from others, the government repeatedly referred to the "lies" the defendants told McDonald's by representing themselves as "legitimate" winners.

In fact, however, the evidence was, from the government's own witnesses, that game stamps were publically traded, including on E-bay and on *McDonald's*

---

[14] Although there were several different games and numerous versions of rules, there was no rule anywhere that affirmatively prohibited a transfer of a game stamp prior to verification as a winner.

*own website*.  A McDonald's representative testified that game players could transfer stamps to anyone – including the stranger in the next booth – prior to sending the piece to McDonald's.  Under these circumstances, defendants argue, it cannot be said that the rules unequivocally prohibited defendants from representing themselves as "legitimate" winners when they acquired their game stamps by transfer from someone else.

We agree.  In the absence of any explicit prohibition of transfer, and in view of the evidence that such transfers were publically tolerated by McDonald's, only if defendants redeemed game stamps that they knew were *stolen* could it be said unequivocally that they knew that they were not "legitimate" winners, since it is a crime to receive stolen property.  Absent such proof, we do not think that representations to McDonald's that *may* have violated the rules of its games could form the basis for a criminal prosecution.  Defendants' conduct was not "plainly and unmistakably" proscribed by 18 U.S.C. § 371.  *See United States v. Porter*, 591 F.2d 1048, 1057 (5th Cir. 1979).

The rule of lenity requires that a criminal conviction not be predicated upon a problematic interpretation and retroactive application of the rules of a private game.  *Ladner v. United States*, 358 U.S. 169, 178 (1958).  If there is doubt

whether the defendants' conduct is criminal, the rule of lenity requires that the

doubt be resolved in favor of the accused. *Id.*

2.  Violation of the Game Rules as Unlawful Act

Even if the transfers had been unequivocally against the rules of

McDonald's games, however, defendants' alleged misrepresentations would still

not constitute criminal fraud. Under the prevailing law, as well as the law of this

case,[15] a violation of McDonald's game rules is not a crime. *See Waible*, 935 F.2d

at 926 (interpreting rule stating that "[g]ame materials are null and void and will

be rejected if not obtained through authorized, legitimate channels . . . "). The

game stamps constitute an offer for a unilateral contract that can be accepted by

performing all the terms and conditions of the game. *Id.* A violation of these

rules, therefore, is, at most, a breach of contract. It is not a crime. *Id.*[16] *See also*

*Barnes v. McDonald's Corp.*, 72 F. Supp. 2d 1038, 1042 (E.D. Ark. 1999) (rules

---

[15] The magistrate judge ruled that a violation of the McDonald's rules was a mere contract breach, without objection from the government. The government conceded this point at the charge conference and the jury was instructed that a violation of the rules of McDonald's games is not a crime.

[16] Nor were defendants under any legal duty to tell McDonald's the truth. *See Johnson*, 602 So. 2d at 889 (contest winner had no legal duty to disclose information regarding how he obtained the winning game piece). Despite the government's repeated references to the "affidavit" that the defendants completed stating they had obtained their game stamps through "authorized channels," the contest form was neither sworn nor attested to in any way. Nor were defendants in any fiduciary relationship with McDonald's. Even if they lied on their prize redemption forms, the lies represented, at most, under the prevailing law and the law of the case, only a breach of the unilateral contract offered by the rules of the game, not a crime.

19

are offer of contract, which are accepted by performance of the contract's terms);

*Johnson v. BP Oil Co.,* 602 So.2d 885, 888 (Ala. 1992) (same).

The indictment alleges, however, that the defendants' claims to be legitimate winners were *illegal*. Although belatedly conceding at the charge conference that *violation* of McDonald's game rules was *not* a crime,[17] the government's position throughout the trial was that the defendants' representations that they had *complied* with the rules *was* a crime.

The government's theory was that the defendants' "false" statements constituted an event totally separate from the violation of the rules that made the statements false. This theory is clearly reflected in the government's response to a proposed defense instruction that it is not a *crime* to give a false statement to a company or person to whom you have no legal duty to tell the truth:

> *It certainly can be.* It can be if you end up using the mail and you're trying to defraud them. (emphasis added)

The government's position, then, is that conduct not illegal, but, perhaps, "illegitimate" may, if the mails are used, be prosecuted as mail fraud.

---

[17] The government finally conceded this point during a charge conference discussion of a proposed defense instruction that a violation of McDonald's game rules would not be a crime, saying, "The horse is dead. I'm not going to ride that horse."

This is exactly the position rejected by the Second Circuit in *United States v. Handakas*, 286 F.3d 92 (2ⁿᵈ Cir. 2002)*.  In that case, the government charged Handakas with a mail fraud conspiracy for failing to pay his construction workers the prevailing rate of wage as provided by his contract with New York City, but *misrepresenting* to the City that he had done so in order to receive contract payments from the City.[18]  At trial, according to the Second Circuit:

> [T]he government thought it sufficient to argue that Handakas was guilty of conspiracy to commit mail fraud simply by violating his non-fiduciary contractual obligation to pay his workers the prevailing rate of wages.  That is what the prosecutor argued to the jury:
>
>> [S]ometimes you care about how things are done, and if you spell that out in contract and you make it clear to the people you are dealing with, as the [City] did here, that not only do you want something but you want it done a certain way, you have a right to that, *and that's what's at issue here.  The [City] had a right to determine how its contracts would be fulfilled.*

*Id.* at 108 (emphasis added).[19]

---

[18]  Handakas submitted certified payroll records that reflected compliance with the prevailing rate of wage requirement.  Handakas, in fact, paid his workers substantially less than half the prevailing rate of wage.  286 F. 3d at 96.

[19]  The contract at issue in Handakas was with a governmental agency so the government argued that Handakas owed a duty of honest services to the City, thereby creating a fiduciary relationship recognized by federal law.  The Second Circuit rejected this argument as well.  The defendants herein, of course, are alleged to have breached a contract with McDonald's, not the government, thereby eliminating the possibility that they owed a duty of "honest services" to McDonald's which they breached, even if the Second Circuit had not already rejected this argument.  286 F.3d at 109.

21

In rejecting this argument, the Second Circuit said, "If we were to affirm Handakas's mail fraud conviction on [these] grounds . . . we would effect a breathtaking expansion of mail fraud. Every breach of a contract . . . would become punishable as a *felony* in federal court." *Id.* at 107. Such an application of the mail fraud statue violates the fundamental guarantee of due process because it fails to provide notice of what conduct is criminal. *Id.* It permits "policemen, prosecutors, and juries to pursue their personal predilections." *Id.* (citing *Smith v. Goguen*, 415 U.S. 566 (1974)).

Here too the government sought to prove conduct not otherwise a crime as the underlying illegal activity supporting the charged mail fraud conspiracy. The government's theory of the charged conspiracy is that, just as did Handakas, the defendants falsely represented that they had performed as required by the terms of a contract – the rules of McDonald's game – and that they are guilty of a mail fraud conspiracy for having used the United States mails to do so.

As did the Second Circuit, we find the implications of such a theory very troubling. The federal conspiracy statute proscribes an agreement to *violate the law*. 18 U.S.C. § 371; *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998) ("[T]he essential element of a conspiracy [is] that the object of the agreement must be *illegal*") (emphasis added). Breach of contract, however, even fraudulent

22

breach of contract, is not a crime. Nor does use of the mails, as the government apparently believes, make it a crime.

Although the indictment alleges unlawful conduct – a scheme to defraud McDonald's by stealing game stamps and redeeming them for money – the government's theory all along and the proof adduced at trial, at most, proved only that defendants *illegitimately*, not unlawfully, redeemed the game stamps.[20] The redemptions were illegitimate in the government's view because they violated the rules of McDonald's game.[21]

Illegitimate conduct, however, is not the same thing as unlawful conduct. Not all conduct that strikes a court as sharp dealing or unethical conduct is a "scheme or artifice to defraud." *United States v. Holzer*, 816 F.2d 304, 309 (7th Cir. 1987). "Such a broad meaning of fraud for the mail and wire fraud statutes 'would put federal judges in the business of creating what in effect would be common law crimes, i.e., crimes not defined by statute.'" *Reynolds v. East Dyer Dev. Co., 545*, 882 F.2d 1249, 1252 (7th Cir. 1989) (quoting *United States v. Holzer*, 816 F.2d 304, 309 (7th Cir. 1987)); *see also Porter*, 591 F.2d at 1057

---

[20] The real unlawful activity – the theft of the game stamps – was abandoned as irrelevant to the defendants' culpability. See discussion below at II.B.2.

[21] Again, we note that this interpretation of the rules is, itself, problematic.

23

(reversing conspiracy conviction predicated upon conduct not prohibited by a statue or regulation).

If we were to hold allegations of an agreement to participate in "illegitimate" conduct – a fraudulent breach of contract – sufficient to convict under the federal conspiracy statute, then we would permit a "breathtaking" expansion of a statute that already is "harnessed into service" by the government when other prohibitions will not serve." *Id.* at 108. The mail fraud conspiracy statute applies broadly enough as it is. We shall not extend its reach even further. The allegations that defendants' claims to be legitimate winners of McDonald's games violated the mail fraud statute should have been stricken from the indictment.

B.     ***Single or Multiple Conspiracies?***

Despite having charged a single conspiracy with two criminal objects, the government's prosecution of the case severed the connection between Jacobson's illegal act of embezzlement and the defendants' "fraudulent" redemptions. The government's position was that it did not matter *how* the defendants obtained the game stamps. The government asserted on numerous occasions that Jacobson's theft of the stamps was legally irrelevant to the culpability of the defendants for their redemptions. The government even argued that the game stamps could have

24

been legitimately obtained by someone other than the individual that redeemed the game stamp,[22] or even been *found on the street*, and the defendants representations would still have been fraudulent. In the government's view, it was the defendants' "misrepresentations" to McDonald's that they were "legitimate" winners that constituted the underlying illegal activity to which the defendants agreed.

The question now is what impact this view of the conspiracy had on defendants' convictions. The defendants argue that it resulted in a fatal variance between the conspiracy charged in the indictment and that proved at trial. Defendants claim that the under the government's theory of the prosecution, not only was Jacobson's embezzlement irrelevant to proof of the conspiracy, but Jacobson, himself, became irrelevant. The result was that the most the government may have proved was a series of conspiracies, not a single conspiracy. We turn now to this issue.

1.  The Conspiratorial Agreement

A conspiracy is an agreement between two or more persons to accomplish an unlawful plan. 18 U.S.C. § 371; *Parker*, 839 F.2d at 1477. The essence of the conspiracy is this agreement to commit an unlawful act. *Toler*, 144

---

[22] The government stated in opening remarks, "[i]n fact, some of the "winners" believed that the game stamp(s) that they redeemed had actually been legitimately won by someone."

25

F.3d at 1425. What distinguishes the offense of conspiracy from a substantive offense, is that "agreement is the essential evil at which the crime of conspiracy is directed." *Iannelli v. United States,* 420 U.S. 770, 777 n. 10 (1975). The agreement itself "remains the essential element of the crime." *Id.* Thus the government must prove the existence of an *agreement* to achieve an unlawful objective and the defendant's *knowing* participation in that agreement.[23] *United States v. Adkinson*, 158 F.3d 1147, 1155 (11th Cir. 1998).

Because the essential nature of conspiracy is secrecy, a conspiracy conviction may be proved by circumstantial evidence. *Glasser v. United States*, 315 U.S. 60, 80 (1942). The government must, however, show circumstances from which a jury could infer beyond a reasonable doubt that there was a "meeting of the minds to commit an unlawful act." *Adkinson*, 158 F.3d at 1154 (quoting *Parker*, 839 F.2d at 1478).

Since no one can be said to have agreed to a conspiracy that they do not know exists, proof of *knowledge* of the overall scheme is critical to a finding of conspiratorial intent. "Nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it." *United States v. Peoni*,

---

[23] The final requirement for conviction is proof of the commission of an act in furtherance of the conspiracy. 18 U.S.C. § 371.

100 F.2d 401, 403 (2nd Cir. 1938). The government, therefore, must prove beyond a reasonable doubt that the conspiracy existed, that the defendant *knew* about it and that he voluntarily agreed to join it. *United States v. Hernandez*, 896 F.2d 513, 519 (11th Cir. 1990).

We have reversed conspiracy convictions where there was no direct proof of an agreement, and the circumstantial evidence of agreement was insufficient to support such an inference. *Adkinson,* 158 F.3d at 1159 (reversing conspiracy convictions where government failed to prove defendants knowingly agreed to unlawful act); *United States v. Awan*, 966 F.2d 1415, 1434-35 (11th Cir. 1992) (insufficient evidence to support finding of unlawful agreement); *Parker*, 839 F.2d at 1478 (insufficient evidence of common agreement). Proof of a true agreement is the only way to prevent individuals who are not actually members of the group from being swept into the conspiratorial net.

In this case, the indictment charged a single conspiracy in which Jacobson was the "key man" who stole the game stamps and then constructed a vast network of co-conspirators who would both redeem the game stamps and recruit others to do so. To convict the defendants of this conspiracy, the government had to prove that the defendants knew of the "essential nature of the plan" and agreed to it. *See*

27

*Blumenthal v. United States*, 332 U.S. 539, 557 (1947); *Adkinson,* 158 F.3d at 1155.

  2. <u>What the Government Proved about the Agreement</u>

  There are *no* allegations in the indictment that any of these defendants knew of Jacobson's plan to steal the game stamps and distribute them to a vast array of recruiters and winners. There are none because Jacobson deliberately set out to keep the fact that there was any overall scheme secret from the defendants. In fact, the government conceded in its opening remarks, "[e]vidence will establish, which will be uncontroverted by the defense, that many of the winners did not know that the winning game stamps(s) that they redeemed had originally been embezzled or stolen."[24]

  At trial, Jacobson testified that he had ten different recruiters to whom he gave game stamps. These recruiters in turn found "winners" to redeem the game stamps. Jacobson testified that *not one* of his recruiters knew any of the others, or even about his theft of the stamps. Nor did any of the winners know of Jacobson, or his embezzlement of the game stamps. It was part of Jacobson's scheme

---

[24] The defendants did not controvert this evidence because lack of knowledge, and therefore, lack of agreement, formed the core of their defense.

28

deliberately to keep each recruiter and the winners developed by each recruiter separate from and ignorant of the existence of the others.

Jacobson's scheme was a classic "hub-and-spoke" conspiracy, in which a central core of conspirators recruits separate groups of co-conspirators to carry out the various functions of the illegal enterprise. *See Kotteakos v. United States*, 328 U.S. 750, 755 (1946); *United States v. Perez*, 489 F.2d 51, 58 (5th Cir. 1973). In such a conspiracy, the core conspirators are the hub and each group of co-conspirators form a spoke leading out from the center in different directions. *Kotteakos*, 328 U.S. at 755. The core conspirators move from spoke to spoke, directing the functions of the conspiracy. *Id.*

Jacobson's conspiracy also had a hub and spokes. He was the hub and his recruiters and winners formed the various spokes. Unlike the classic hub-and-spoke conspiracy, however, Jacobson was the *only* conspirator in the hub, and when he moved from spoke to spoke, he moved alone. There was no time at which he and another conspirator moved from spoke to spoke.

The Supreme Court has characterized such a conspiracy as a "rimless wheel" because there is no rim to connect the spokes into a single scheme. *Kotteakos*, 328 U.S. at 755. In *Kotteakos*, several different defendants fraudulently obtained loans through the central key man, Brown. There was,

29

however, no connection *between* the defendants. They were connected only to Brown. The trial court had upheld the jury's convictions of these defendants on the theory that "it was possible on the evidence for the jury to conclude that all were in a common adventure because of [each defendant's connection to Brown in one or more transactions] and the similarity of purpose presented in the various applications for loans." *Id.* at 768-69.

The Supreme Court, however, reversed the convictions, holding that the trial court "confuse[d] the common purpose of a single enterprise with the several, though similar, purposes of numerous separate adventures of like character." *Id.* at 769. As the Court put it:

> [T]he pattern was 'that of separate spokes meeting at a common center,' though we may add without the rim of the wheel to enclose the spokes. The proof therefore admittedly made out a case, not of a single conspiracy, but of several, notwithstanding only one was charged in the indictment.

*Id.* at 755. Thus, where the "spokes" of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes. *Id.* at 754-55.

Recently, the Fourth Circuit applied *Kotteakos* to affirm the dismissal of an indictment charging a similar rimless wheel conspiracy. *Dickson v. Microsoft*

30

*Corp.*, 309 F.3d 193, 203 (4ᵗʰ Cir. 2002). The court noted that *Kotteakos* made clear that a rimless wheel conspiracy is not a single, general conspiracy but instead is a series of multiple conspiracies between the common defendant and each of the other defendants. *Id.* "A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Id.*

We too have noted "[t]he importance in a wheel type conspiracy of such knowledge by individual spokes of the existence of other spokes." *Perez*, 489 F.2d at 60 n. 11 (citing *Federal Treatment of Multiple Conspiracies*, 57 Columbia Law Review 387). "[F]or a wheel conspiracy to exist, those people who form the wheel's spokes must have been *aware* and must do something in furtherance of some single, illegal enterprise. If not, there is no rim to enclose the spokes." *United States v. Levine*, 546 F.2d 658, 663 (5ᵗʰ Cir. 1977) (emphasis added). *See also United States v. Abraham*, 541 F.2d 1234, 1238 (7ᵗʰ Cir. 1976) (the parties to an agreement must know of each other's existence).

We have reversed convictions where such knowledge was lacking, finding no agreement to the overall conspiracy, and holding that the individual spokes constituted separate conspiracies. *United States v. Ellis*, 709 F.2d 688, 690 (11ᵗʰ

Cir. 1983); *United States v. Nettles*, 570 F.2d 547, 551 (5th Cir. 1978); *Levine*, 546 F.2d at 663. We have never upheld a conspiracy conviction where a single key man moved alone from spoke to spoke, agreeing with no one else common to more than one spoke.

In this case, there was no connection whatsoever between the various spokes of Jacobson's scheme. Just as with Brown in *Kotteakos*, Jacobson was the only person common to the ten otherwise completely separate undertakings, no other person moving with him from spoke to spoke. The government conceded early on and at trial that the spokes knew nothing about each other or, indeed, about Jacobson's theft of the game stamps and his overall scheme. Jacobson, himself, so testified. In the face of this fact, the government took the only position it could – that such knowledge was irrelevant to proof of the charged conspiracy.

This was error of constitutional proportions. In order to prove the charged conspiracy, the government had to show that the defendants knew and agreed to some scheme larger than their own spoke, involving only receipt of a game stamp from their immediate recruiter and its "illegitimate" redemption. *Iannelli*, 420 U.S. at 777; *Toler*, 144 F.3d at 1425. Without evidence of an agreement to participate in the larger scheme charged in the indictment, the government proved only that there may have been multiple conspiracies, each with Jacobson as the unknown key man,

32

the recruiter and, had they known of Jacobson's thefts, the redeemers. *See Barnard v. United States*, 342 F.2d 309, 312-13 (9th Cir. 1965) (without some evidence that individual spokes knew about others, there was not a conspiracy for a succession of fraudulent collisions, but rather a succession of separate collision conspiracies); *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969) (reversing conviction where insufficient evidence that similar hijackings part of one overall conspiracy).

The shift of focus from Jacobson's scheme to embezzle and redeem game stamps to multiple schemes to make false statements to McDonald's represented the governments' acknowledgment that it could not prove that the defendants knew of and joined Jacobson's scheme. In the absence of any proof to connect the spokes of the conspiratorial wheel, both Jacobson and his embezzlement were abandoned as central to the prosecution's case.[25]

This will not do. Although the defendants' alleged misrepresentations to McDonald's might have constituted acts in furtherance of the charged conspiracy, proof of such misrepresentations *alone* does not prove they joined the conspiracy indicted by the grand jury to embezzle and fraudulently redeem the game stamps.

---

[25] The government employed a similar tactic in *Parker*. Unable to prove that the defendants knew of the overall scheme, the government argued "even if appellants truly were unaware of the [overall fraudulent scheme], it does not follow that their representations to investors were not fraudulent." 839 F.2d at 1480. In that case, we decided that the appellants' representations were not "wholly unfounded" and "certainly not criminal." *Id.* at 1481. We reached a similar conclusion above.

33

While a single conspiracy may have two illegal objects, without proof of some

*connection* between these objects, it is not a *single* conspiracy.

The Third Circuit reached a similar conclusion in *United States v. Pearlstein*,

576 F.2d 531, 544 (3d Cir. 1978). In that case, a jury convicted salesmen of mail

fraud based on their alleged participation in a conspiracy to defraud investors in a

writing pen distributorship. While conceding the existence of an overall scheme to

defraud, the salesmen maintained that they were ignorant it. In the absence of any

direct proof that they did know of the scheme, the government sought to convict

the defendants based on certain false or misleading statements made by them in

their sales pitches, arguing that these statements established the necessary link

between them and the overall scheme to defraud.

The Third Circuit rejected this argument and reversed their convictions,

noting that:

> [A]lthough the defendants might have made fraudulent
> misrepresentations during the course of their individual sales
> presentations, the jury could not reasonably infer that the salesmen
> knew of the fraudulent purpose of the overall . . . scheme.

*Id.* At 545.

Furthermore, the court rejected the idea that these misrepresentations could

form the some sort of independent basis for their conspiracy convictions because

"[a]lthough . . . a separate scheme to defraud could have been hatched by these salesmen within the overall scheme, such individual schemes were neither alleged nor proved by the government in this case." *Id.* The court noted that:

> Even if the evidence established independent schemes of the salesmen, such evidence could not properly convict the defendants here since the only scheme alleged in the indictment was that of the . . . principals, and *it was incumbent upon the Government to prove that scheme substantially as it was alleged.*

*Id.* n. 7 (emphasis added); *see also Toler*, 144 F.3d at 1426 ("[T]he government must prove the conspiracy it charged in the indictment rather than some other conspiracy").

In *United States v. Simon*, 839 F.2d 1461, 1468 (11th Cir. 1988), we acknowledged the persuasiveness of the *Pearlstein* rule that individual and independent misrepresentations do not permit an inference of knowledge of and agreement to join the overall scheme. If the defendants have no knowledge of the overall conspiracy, their independent, even fraudulent, misrepresentations do not supply that link. *Id.*

In this case, it was the government's position from the beginning that the defendants' alleged misrepresentations were totally independent of Jacobson's underlying scheme. The government consistently maintained, and argued to the jury, that the defendants' claims to be "legitimate" winners were false totally

35

irrespective of Jacobson's embezzlement.[26] The defendants' claims were criminally fraudulent, the government insisted, *solely* because they received the stamps by transfer, rather than by buying food items at McDonald's. Defendants' misrepresentations, then, were made "on their own," without any knowledge of Jacobson's embezzlement and scheme. As such they were utterly incapable of permitting any inference that defendants knew of and agreed to the charged conspiracy. *See Pearlstein*, 576 F.2d at 545; *Simon*, 839 F.2d at 1468.

Without some evidence that defendants knew the essential nature of *Jacobson's* conspiracy, they could not be convicted of agreeing to it. The trial judge belatedly realized this fundamental fact when, five minutes before instructing the jury, he decided to give the defense instruction previously rejected, requiring the jury to find that the defendants knew of Jacobson's scheme before convicting them. In so doing he said:

---

[26] The government's claim that Jacobson's theft of the game stamps was legally irrelevant to defendants' culpability for the overall conspiracy charged in the indictment really turned the case on its head. In fact, it was defendants' alleged misrepresentations to McDonald's that were, in fact, legally irrelevant to their culpability for the charged conspiracy. Defendants' redemptions would have been criminally fraudulent even without any misrepresentations *had they known that the game stamps were stolen.* Without such knowledge, no amount of representations violating McDonald's rules could make defendants liable for the conspiracy charged by the government to fraudulently redeem stolen game stamps. *See United States v. Christo*, 614 F.2d 486, 492 (5th Cir. 1980) (evidence of violations of civil banking regulation legally irrelevant to defendant's guilt for criminal bank fraud).

And I'll point out that I think one of the major issues is whether or not we're dealing with a single conspiracy or multiple conspiracies. . . . I am going to instruct the jury in this case that if you should find that a reasonable doubt exists as to whether a defendant had knowledge that the game stamp he obtained had been embezzled, stolen or otherwise unlawfully acquired, then you must find that defendant not guilty. I think other – otherwise, then you – the issue of a bunch of conspiracies looms more prevalent.

Thus, the court recognized and attempted to cure the variance between the conspiracy charged in the indictment, and the several conspiracies the government sought to prove at trial by requiring the jury to find that the defendants had knowledge of Jacobson's embezzlement. Only in this way could the jury find that

the defendants knowingly agreed to participate in the overall scheme.[27]  As we said

in *Adkinson*:

> The government may not rest upon proof that a defendant acted in a
> way that would have furthered the goals of the conspiracy *if there had
> been one.*  Without some independent evidence that these defendants
> *knew* there was a [ ] conspiracy in progress and that they voluntarily
> and knowingly joined this conspiracy, the proof of the requisite
> agreement to [commit the offense] is insufficient.

158 F.3d at 1155.

The absence of any evidence of a common goal, overlapping membership

among the various spokes of the conspiracy, or interdependence of the spokes

reinforces our conclusion that the government failed to prove a single conspiracy.

---

[27]  Unfortunately, the court's attempt to cure the problem only aggravated it.  The court's new instruction permitted the jury to find the defendants guilty if they knew the game stamps were "embezzled, stolen, or *otherwise unlawfully acquired.*"  This language is not found in the indictment.  Although the government argues that it narrowed rather than broadened the indictment, thus rendering the error harmless, we disagree.

The government's theory throughout the case, reflected in the extensive testimony and numerous exhibits about the rules of McDonald's games, was that the defendants had "illegitimately" redeemed these game stamps by virtue of the fact that they did not personally acquire them from McDonald's.  The government interpreted the rules of McDonald's games to prohibit acquisition of the game stamps by transfer from another person.  In closing argument, the government argued that acquisition of the game stamp by transfer made the winner "illegitimate," thereby implying that acquisition in this way was "unlawful."  Thus the government's argument tied the court's unwitting addition of "unlawfully acquired" language into the government's theory that transfer of the game stamps made the winners "illegitimate."

Furthermore, in rebuttal, the government argued that one defendant knew his game stamp was "unlawfully acquired" because he was asked to redeem it for someone who wanted to avoid splitting the proceeds with his soon-to-be divorced wife.  This argument could not have been made if the court's instruction had required the jury to find defendants knew the game stamps were embezzled or stolen.

First, although each of these alleged spoke conspiracies had the same goal, there was no evidence that this was a *common* goal. Although each spoke directed its efforts toward the goal of redeeming game stamps for money, there was no evidence, indeed the government conceded, that no spoke was aware that it was participating in anything larger than its own redemptions. *See Barnard*, 342 F.2d at 313 (reversing convictions for single conspiracy where no evidence showed that the individual planning of five separate accidents contemplated more than that particular one). There was certainly no evidence that they agreed to do so. Each spoke represented a separate scheme, joined by no overall objective to be achieved by multiple actions. *See Perez*, 489 F.2d at 62.

In order to prove a single, unified conspiracy as opposed to a series of smaller, uncoordinated conspiracies, the government must show an interdependence among the alleged co-conspirators. *Toler*, 144 F.3d at 1426. Separate transactions are not necessarily separate conspiracies, so long as the conspirators act in *concert* to further a common goal. *United States v. Powell*, 982 F.2d 1422 (10th Cir. 1992). If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, then those performing the functions are engaged in one conspiracy.

39

"[I]f a defendant's actions facilitated the endeavors of other coconspirators or *facilitated the venture as a whole*," then a single conspiracy is shown. *Id.* at 1429.

In this case, there was no such interdependence of the spokes. The combined efforts of the spokes were not required to insure the success of the venture. No spoke depended upon, was aided by, or had any interest in the success of the others. Each spoke acted independently and was an end unto itself.[28] The actions of one spoke did not facilitate the endeavors of other coconspirators or the venture as a whole. We have reversed conspiracy convictions where no interdependence was shown. *See Ellis*, 709 F.2d at 690 (no evidence permitting inference that spokes knew of each other or interacted in any way); *Nettles*, 570 F.2d at 551(same).

Nor was there any evidence of an overlap of membership between the spokes. There was none. The only member common to each separate spoke was Jacobson. The government's argument in its brief notwithstanding, a single conspiracy is not shown if Jacobson was the only overlapping member. *Adkinson*, 158 F.3d at 1153 ("The government must prove an agreement between at least two

---

[28] In a drug conspiracy, in which the object of the conspiracy is clearly illegal and there are various clandestine functions to perform, the conspirators can be charged with knowledge that others are performing these different functions. *See United States v. Bruno*, 105 F.2d 921 (2d Cir. 1938). In this case, however, such knowledge may not be imputed to defendants since each of their redemptions was complete unto itself.

40

conspirators to pursue jointly an illegal objective"); *Parker*, 839 F.2d at 1478 ("The law is well settled that existence of a coconspirator is not only an element of the crime, but the very essence of the crime").

All the evidence, especially that from the government's own witnesses, was that every effort was made not to put a rim on the wheel of Jacobson's conspiracy. Not only was there no connection between the spokes, but the spokes had no knowledge of the hub. This is not a single conspiracy. *Kotteakos*, 328 U.S. at 769. If conspiratorial, it is a series of uncharged separate conspiracies. *See Pearlstein*, 576 F.2d at 545.

The government argues that this variance between the conspiracy charged and the proof at trial is harmless error. *Kotteakos*, 328 U.S. at 725. The remaining question is whether the variance in the proof prejudiced the defendants. There can be no doubt that it did.

As in *Adkinson*, the government alleged conduct not a crime, spent hours eliciting testimony regarding that "crime," only to concede to the court at the end of trial that the law was to the contrary. As then, "[d]efendants were forced to defend themselves against charges which were not offenses under the prevailing law." 135 F.3d at 1373. Defendants herein were forced to decide whether to

defend against or not defend against the charge that they violated the rules –

precisely what the right to indictment was meant to prevent.  *Id.*

Then, at the conclusion of a trial filled with evidence of these rules, the

district court decided that this was not what the trial had been about, and that the

only unlawful conduct upon which convictions lawfully could have been based all

along was the charged conspiracy to *redeem stolen* game stamps.  The court

decided it must give the previously rejected proposed defense instruction to this

effect.  Thus, the court announced it would instruct the jury that they could convict

only if they found that the defendants redeemed game stamps that they *knew* were

"*embezzled*, *stolen*, or *unlawfully acquired*."  This instruction, announced by the

court five minutes prior to charging the jury, completely reversed the court's prior

position that such knowledge was unnecessary for conviction,[29] rendered totally

irrelevant most of the government's case, and left totally exposed the utter absence

of any such proof in the record.[30]

Despite the court's instructions to the jury that they could not convict absent

proof that defendants knowingly agreed to the charged conspiracy, that they could

---

[29]  Induced, of course, by the government's motion in limine requesting such a ruling, and counseled by the government that such knowledge was irrelevant under the government's theory.

[30]  Indeed, as we noted above, the government sought a recess to call the Justice Department for permission to dismiss the case.

not find the defendants guilty of violating the rules of McDonald's games, and that

transfer of a game stamp from another person was not proof of fraud, the

defendants were convicted. It appears that the jury convicted these defendants of

violating the rules of McDonald's games. In the utter absence of any proof,[31] plus

the government's avowed concession that these defendants *did not know* that the

game stamps had been embezzled or stolen (or even "unlawfully acquired"), there

is no other explanation for the jury's verdict. Thus, we do not believe that the

court's last minute attempts to cure the problems inherent in the government's

---

[31] The government's only theory of culpability capable of withstanding the test for relevance imposed by the court's ultimate jury instructions was that the defendants showed a "reckless disregard" for the truth by failing to ask the right questions regarding the origin of the game stamps. Sufficient evidence of such a reckless disregard would support a jury inference that the defendants *should have known* of the unlawful origin of their game stamps, thus permitting conviction. *Parker*, 839 F.2d 1479; *United States v. Sawyer*, 799 F.2d 1494, 1401-02 (11th Cir. 1986). Although the government propounded this argument, it offered little but speculation to support it. We find nothing in the evidence that would permit an inference beyond a reasonable doubt that the defendants recklessly disregarded strong indications that their redemptions were *unlawful*. On the contrary, the evidence was that the defendants were repeatedly told there was nothing unlawful about their redemptions. They were told various stories regarding the need for their redemptions, ranging from hiding the proceeds from divorced or divorcing wives, to aiding McDonald's in maximizing the geographical diversity of winners, to avoiding taxes by finding winners in lower income tax brackets. Whatever the *illegitimacy* of these reasons for agreeing to redeem game stamps, none was *illegal*. The most the government was able to show was that one defendant was told the game was "fixed." In view of the record evidence that McDonald's itself could be viewed as having "fixed" the game – by deliberately excluding Canada from receiving any high-value winning game pieces – we cannot hold that it established beyond a reasonable doubt that defendants had a reckless disregard for the truth. There was no proof whatsoever that any defendant recklessly disregarded the truth about the *unlawful* activity underlying the criminal conspiracy charged – the embezzlement of the game stamps.

theory of the case (and to salvage something of the time and effort devoted to the case) adequately protected the defendants from the prejudice that resulted.

Not only were defendants convicted of conspiracies not charged in the indictment, but the government has conceded that there is no proof to support defendants' membership in the indicted conspiracy – Jacobson's conspiracy. Thus, there is a complete failure of proof as to the charged conspiracy. The motions for judgments of acquittal should have been granted.

III.

This case involved an unfortunate series of events, resulting in convictions that cannot be sustained. Federal conspiracies are not proved by evidence of illegitimate conduct. Nor does the unlawful conduct of one person become a conspiracy because many people commit acts which would further the conspiracy, if one existed. Because the convictions in this case were predicated upon both of these trial errors, we must reverse.

Accordingly, the denials of the motions for judgment of acquittal are REVERSED, the convictions are VACATED, and the case is remanded for the entry of judgments of acquittal for each of the defendants.