[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 17-15003

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant-Cross-Appellee,

*versus*

MATTHEW WILLIAM WHEELER,
a.k.a. Matthew Williams,
JAMES WAYNE LONG,
a.k.a. J.W. Long,

Defendants-Appellees-Cross-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cr-20715-MGC-9

_____

———————————

No. 17-15030

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ANITA SGARRO,
a.k.a. Anita Simone,
CHARLES DAVID SMIGROD,
a.k.a. Charles David,
CHARLES K. TOPPING,
a.k.a. CharlieKenn,

Defendants-Appellants.

———————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cr-20715-MGC-5

———————————

_____

No. 17-15379

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant-Cross-Appellee,

*versus*

JAMES WAYNE LONG,
MATTHEW WILLIAM WHEELER,
a.k.a. Matthew Williams,

Defendants-Appellees-Cross-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cr-20715-MGC-12

_____

Before WILSON, LAGOA, and BRASHER, Circuit Judges.

PER CURIAM:

This is a criminal appeal involving five co-defendants who were charged with wire fraud, mail fraud, and conspiracy for their alleged involvement in a telemarketing scheme to defraud stock investors. After an eight-week trial, in which the defendants made several motions for mistrial, the jury found each defendant guilty on all counts. At a post-trial hearing, the district court found that the prosecution had acted improperly in closing argument but denied the defendants' motions for mistrial. The court then granted judgments of acquittal based on insufficient evidence as to defendants Matthew Wheeler and James Wayne Long. As to the other three defendants—Charles Smigrod, Anita Sgarro, and Charles Topping—the court denied their motions for judgment of acquittal.

The government appeals the judgments of acquittal granted to Wheeler and Long. Smigrod, Sgarro, and Topping appeal the court's denial of their motions for judgment of acquittal and argue that, in the alternative, prosecutorial misconduct warranted a mistrial. Additionally, Sgarro and Topping argue that we should reverse their convictions based on a variety of erroneous evidentiary rulings and improper jury instructions. They also challenge their sentences. Wheeler and Long join their co-defendants in arguing on cross-appeal that even if we find that the jury's verdict was based on sufficient evidence, prosecutorial misconduct tainted the trial and requires us to reverse the convictions. We consolidated the appeals and cross-appeal after briefing on the merits.

After careful review and with the benefit of oral argument, we reverse the judgments of acquittal granted to Wheeler and Long because there is a reasonable construction of the evidence that supports the jury's verdicts as to those two defendants. We also find that sufficient evidence supported the convictions of Sgarro, Smigrod, and Topping. On the question of prosecutorial misconduct, we find that the prosecution's behavior at trial did not rise to the level of misconduct. Nor do any of the district court's evidentiary rulings or the jury instructions warrant reversal. Finally, we find no error in the district court's sentencing of Sgarro, Smigrod, and Topping.

## I.    Factual and Procedural Background

### A.    The Stock-Selling Operation

The government charged the defendants in this case for their alleged roles in a telemarketing scheme that tricked investors into making stock purchases and misappropriated their money. The defendants operated from two phone rooms. One was located in Florida and managed by Miguel Mesa; the other was located in California and managed by Sgarro. Both phone rooms initially sold the stock of a company called Sanomedics International Holdings; the Florida phone room later switched to selling the stock of a gaming company called Fun Cool Free, Inc. (FCF). Sanomedics, which was run by Craig Sizer (owner and founder), Keith Houlihan (CEO), and Mesa (in charge of Sanomedics' stock-selling

operation),[1] manufactured and marketed a non-contact infrared thermometer. Its stock was listed on the over-the-counter market.[2] FCF sold a video game that was available for purchase on Apple's App Store.

Each of the five defendants had a particular role in the stock-selling operation. Wheeler, Long, and Smigrod worked as sales-people in the Florida phone room. Wheeler, who sometimes used the alias "Matt Williams" with investors, sold Sanomedics stock from 2009 to 2012 and FCF stock during 2015. Long, using his real name with investors, joined the operation near the tail end in 2015. He sold FCF stock for about six months and had no involvement in Sanomedics stock. Smigrod, going by the name "Charles David" (his first and middle names), started out selling Sanomedics stock and later transitioned to selling FCF stock.

The government alleged that Sgarro and Topping performed a broader range of functions. Sgarro, as the manager of the California office, instructed salespeople on how to pitch Sanomedics stock. She also personally pitched and sold the stock, introducing herself to investors as "Anita Simone" from Sanomedics' "investor relations." Topping, using the moniker "Charlie Kenn,"

---

[1] Sizer, Houlihan, and Mesa were all charged in the same indictment as the defendants but pleaded guilty before trial.

[2] An "over-the-counter" market is a securities market that functions without a central exchange. Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg & Lowenfels on Securities Fraud* § 1:2 (2d ed.).

worked in the Florida office where he was a "loader." As a loader, Topping played an important role in a two-part process that was often used by both the California and Florida locations. First, a salesperson would cold call a potential investor using an autodialer and would pitch an investment opportunity. Then, if the salesperson secured an initial investment, he would offer to connect the investor with a high-level executive who would be able to sell special "institutional" shares—or so investors were told. The government alleged that Topping would play the role of that high-level executive. If Topping successfully sold the investor additional "institutional" shares, both he and the referring salesperson would make a commission on that transaction. Topping first sold Sanomedics stock and later sold FCF stock.

Both the Florida and California phone rooms used prepared written materials to aid their pitches to investors. There were press releases, for example, that were created by Houlihan, posted online, and distributed to the sales team by Mesa. Sizer and Mesa also developed scripts for salespeople to use in their pitches. The press releases and scripts contained some accurate information but also included exaggerations and fabrications. Working partly off these press releases and scripts, salespeople made false representations to potential investors, including that they were paid only in company stock and did not work for commissions, and that important businesspeople or celebrities were involved in the company they were pitching.

8                    Opinion of the Court                    17-15003

In addition, although Sanomedics and FCF were real companies with real products—and investors were really issued stock in the companies—investors were misled as to how their money would be used.  Salespeople often assured investors that their money would fund business development and expansion plans, but very little of the money actually was used for such purposes.  Most of the $23 million or so that investors sunk into Sanomedics and FCF stock went to Sizer and Mesa.  A little less than twenty percent was split among ten salespeople, including the five trial defendants.  Between Sanomedics and FCF, the defendants took in the following sums: $1,207,000 for Topping, $1,070,000 for Sgarro, $162,000 for Wheeler, $148,000 for Smigrod, and $17,000 for Long.

### B.    The Indictment

A September 2016 indictment charged thirteen co-defendants with substantive mail and wire fraud and conspiracy to commit mail and wire fraud.  The indictment alleged conspiracy to commit mail and wire fraud under 18 U.S.C. § 1349: Count 1 in connection with Sanomedics and Count 11 in connection with FCF.  Counts 2 through 10 alleged mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, in connection with the sale of Sanomedics stock.[3]  Counts 12 and 13 alleged mail fraud in connection with the sale of FCF stock.

---

[3] The government voluntarily dismissed Counts 4 and 5 before trial.

Eight defendants—including ringleaders Sizer and Mesa—pleaded guilty.  The other five—Wheeler, Long, Smigrod, Sgarro, and Topping—went to trial.

## C.    The Trial

Trial began in April 2017 and lasted eight weeks.  Among the witnesses who testified in the government's case-in-chief were two of the alleged co-conspirators who had pleaded guilty, sixteen investors who had bought stock from the defendants, and a confidential informant, Stuart Rubens, who took a job undercover in the Florida phone room.  Rubens testified that he had previously been convicted of fraud for participating in a scheme similar to Sanomedics.  He highlighted similarities between the Florida phone room and other criminal operations he had experience with, which he referred to as "boiler rooms."  The government also presented evidence of the defendants' sales scripts and commission sheets, along with other documents seized in an FBI raid of the Florida phone room.

The record on appeal shows that the trial evidence included the following.  All the defendants but Long used an alias or nickname with investors.  The defendants often claimed that they were employees of the company they were pitching, although in truth they worked for a company called Hemisphere Management that was owned by Mesa.  They claimed that they were paid only in company stock, though they really made commissions of roughly fifteen to twenty percent.  They told investors that they were offering stock in a company that was making—or was on the verge

of making—millions in profits, although the company was never really close to generating profits of that scale. And they sometimes told investors that the company they were pitching was associated with a celebrity, a well-known business executive, or another successful company—representations that were based on half-truths or totally false.

After the government rested, the defendants called several of their own witnesses. Houlihan, as the author of the Sanomedics press releases, testified that much of the information in the press releases was true although embellished. And Gary Miller, a salesperson who worked for Sgarro in the California phone room, testified that he pitched Sanomedics stock to investors using information he gathered from conference calls with Mesa. According to Miller's testimony, he believed that the information from Mesa was true, and that Sanomedics was a good investment.

Miller's testimony took a twist on cross-examination when the prosecution asked whether he had "a different business" with Sgarro. Miller denied having any business association with Sgarro aside from selling Sanomedics stock. After some discussion with counsel at sidebar, the court determined—over objections from the defendants—that the prosecution could impeach Miller with a prior inconsistent statement he had made to an FBI agent, to the effect that he sold drugs with Sgarro. The district court ruled that, under Federal Rule of Evidence 613(b), the prosecution could ask Miller: "[D]id you ever tell Agent X that you sold marijuana to defendant Sgarro[?]" And "[i]f the witness denies making the

statement," the court determined, "the agent can be called to say he made the statement." Before proceeding, the court read the following limiting instruction to the jury:

> [Y]ou determine the credibility of the witnesses in this case. You decide who to believe and what to believe. You are about to hear testimony that this witness testified differently than his trial testimony. . . . The testimony is not offered to prove the truth of the statement. It is offered only to assist you in determining the credibility of this witness.

The prosecution proceeded to cross-examine Miller. In what was apparently a volatile exchange, the prosecutor asked Miller several times if he told the FBI that he sold marijuana with Sgarro. Miller repeatedly denied having done so. In rebuttal, the prosecution called an FBI agent who testified that Miller had in fact made statements about selling drugs with Sgarro.

After the defendants rested, the parties' attention turned to the jury instructions. To provide some context, this case went to trial in 2017 on the heels of our decision in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir.), *opinion modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016) (per curiam). Based on the recent *Takhalov* decision, the defendants sought a jury instruction after the close of evidence to convey the distinction between an intent to deceive and an intent to defraud. The defendants' theory was this: evidence that the defendants used aliases or misrepresented their employer, for example, might prove the defendants'

intent to deceive, but it would not prove their intent to defraud so long as the investors got the stock they bargained for at the agreed-upon price.

The defendants requested that the court insert clarifying language from *Takhalov* in the jury instruction on the elements of the offenses. Because the pattern instructions had not been updated since *Takhalov*, the defendants argued that there was "confusion between . . . the . . . instructions as they exist in the pattern versus what *Takhalov* has cleared up."[4] The court decided that it would give the standard pattern instructions unaltered, but would also give a theory-of-defense instruction that incorporated *Takhalov*. The government would be allowed to attack the theory of defense, the court explained, by arguing to the jury that the theory "doesn't match up with the evidence."

In a charge conference on the twenty-seventh day of trial, the government argued that telling the jury about *Takhalov*'s holding—even in a theory-of-defense instruction—would only confuse them. The court maintained that while it would not alter the instructions on the elements of wire fraud, it would allow an instruction that presented the defendants' theory that they lacked an intent to harm under our holding in *Takhalov*.

---

[4] We have since adopted new pattern jury instructions for mail and wire fraud that incorporate *Takhalov*'s holding. *See* 11th Cir. Std. (Crim.) Jury Instr. O50.3, O51 (2019) ("Proving intent to deceive alone, without the intent to cause loss or injury, is not sufficient to prove intent to defraud.").

The prosecutor expressed concern that the jury would lend too much credence to the instruction if it came from the court.

> [PROSECUTOR]: [The defendants] . . . can argue all that until they get blue, and if they create a reasonable doubt, they win, God bless them, but when it comes from Your Honor's mouth instructing the jury on that theory, that's where I take issue. I believe it's unnecessary.

The court stressed, however, that the law did not require the jury to accept the defendants' *Takhalov* defense. The application of the defense theory to the facts of this case was for the jury to determine.

> THE COURT: I don't want the jury to think this is part of the actual substantive instruction. I want them to understand this is defendants' theory. . . .
>
> [PROSECUTOR]: Judge, we're making some progress. We agree that as long as it's clear that this is the defendants' theory, not coming from Your Honor—
>
> . . .
>
> THE COURT: That's why I'm trying to take out anything that says the law requires or this requires.
>
> . . .
>
> THE COURT: "[T]his is a theory, not a legal instruction."

When the charge conference resumed the next day of trial, the defense continued to argue that *Takhalov was* the law—it had clarified that proving deception alone is not enough to sustain a conviction. That legal framework should be presented to the jury, the defendants argued, so that the jury could decide whether the government proved more than mere deception in this case. The prosecution, for its part, continued to spar with the court about whether the theory-of-defense instruction, which highlighted that the government had to prove more than an intent to deceive, was necessary.

> THE COURT: If you read the opening paragraph of Takhalov, it says the wire fraud statute does not enact as federal law the 9th commandment given to Moses on Sinai. . . .
>
> [D]eceiving does not always involve harming another person. Defrauding does. That a defendant merely induced the victim to enter into a transaction that he otherwise would have avoided is, therefore, insufficient to show wire fraud. . . .
>
> [PROSECUTOR]: But that's not the holding, Judge. That's not the holding. That's their introductory remarks. . . .
>
> . . .
>
> THE COURT: I don't agree . . . .

Still, the prosecutor continued to argue that proving the defendants' intent to deceive was sufficient and that a contrary ruling would be irreconcilable with the text of the mail fraud statute.

[PROSECUTOR]: Do you believe Takhalov over-ruled the mail fraud statute, Your Honor, or changed it?

. . .

Judge, the wire fraud and mail fraud statutes have the words.

. . .

You read it yourself, deceit is a form in which to prove the fraud.

THE COURT: We're going to have to agree to disagree here.

The district court thus maintained that it would not alter the instructions on the wire-fraud elements, but that it would include a separate theory-of-defense instruction. The finalized instruction read as follows:

> It is Defendants' Theory of Defense that they did not knowingly and intentionally participate in a fraud, and that the fraud actually occurred when, unbeknownst to the Defendants, the owners and officers of the corporations, Craig Sizer and Keith Houlihan, together with Miguel Mesa, stole millions of dollars in investor funds. Although they may have been aggressive salesmen, they did not intend to defraud the investors, and that they were unwitting pawns in the scheme orchestrated by the owners and Mesa to steal investors' funds [sic].

Defendants contend that there is a difference between deceiving and defrauding.  To defraud the defendants must have intended to use deception to cause financial harm to investors.

In other words, if a defendant selling stock reasonably believes that it had value, and the price charged reflects that value, his or her use of deceit would not constitute a scheme to defraud.  Deceiving does not always involve harming another person; defrauding does.

Fraud requires proof of a material misrepresentation, or the omission or concealment of a material fact.  Mere "puffing" or "seller's talk" is insufficient.

Although the defendants had objected to framing the instruction as a theory of defense rather than an instruction on the elements of the offense, they relied heavily on the instruction in closing argument.  Even if the defendants unwittingly deceived investors, they argued, the investors still got the number of shares they bargained for at the price they bargained for.  There was no intent to harm investors, the argument went, because the defendants thought they were selling valuable stock; they were unaware that higher-ups in the organization were victimizing the investors by pocketing the bulk of their investments.

Next came the prosecution's rebuttal.  The prosecution argued to the jury that the theory-of-defense instruction was "not the Court's    instruction"    [but]    merely    [the    defense's]    theory."

"[H]undreds of years ago," he said, "it was a theory that the sun revolved around the earth, and that the earth itself was flat. But as we know, evidence has disproven those theories, similar to the case at bar." Shortly thereafter, the prosecution returned to the theory of defense, directing the jury's attention to page 23 of the court's instructions. "This page is very special," he told the jury. "It's special because it's not the law. It is not the law. Of the 32 pages in your hands, 23 is no more—" Defense counsel then objected, but the court overruled the objection and the prosecutor continued.

> [PROSECUTOR]: It's a theory of defense. Okay? 23 is, as you can see at the top—we'll go through it real quick—it is the defendant's theory of defense. That's their theory. That's the one where it says they were unwitting. The next paragraph says the defendants contend. They already told you what they contend. They already had a shot. They all went. Some talked for an hour. Some talked for an hour and 40 minutes. . . . The rest of this page, again, is what they believe. . . . So again, page 23, it's in the packet. The Judge obviously thought it was important for you to have it. But ladies and gentlemen, this is not the law. This is a theory of defense.
>
> [DEFENSE COUNSEL]: Objection, Judge.
>
> THE COURT: Sustained.

After the prosecutor concluded his closing argument and the jury exited the courtroom, the court immediately admonished the prosecutor for his "this-is-not-the-law" argument.

THE COURT: You know, [ ] we worked very hard to craft instructions in this case that maybe not everyone agreed with but [ ] that I thought would pass legal muster and for you to take the defendants' theory of the case instruction and basically tell the jury it's a joke, that was wrong. Wrong. Now, whether it rises to the level of mistrial, . . . I'll take care of at a later point . . . . [B]ut you basically trashed the instruction they asked for . . . .

The defense didn't like it, you didn't like it. It's not up to whether people like it, it's as to whether I think it's a correct statement of the law, and I thought it was.

The court then brought the jury back into the courtroom and restated its general charge, including the following instruction: "You must follow the law as I explained it to you, even if you do not agree with it. And you must follow all of my instructions as a whole. You must not single out or disregard any of the instructions that I gave you in this trial."

After sending the jury to deliberate, the court reiterated to counsel that the theory-of-defense instruction "was appropriate given the law and the facts of this case." The court questioned why the prosecution "would take our hard work . . . [in] crafting [the instruction], and basically almost tell the jury it doesn't matter." The government "can't just disregard an instruction because . . . they don't like it," the court added.

Subsequently, the court heard oral argument on the defendants' motions for mistrial. Counsel for Sgarro pointed out that a theory-of-defense instruction incorporates the defense's view of the facts, "but the law is what [the court] give[s] the jury." "We may not agree with the instruction that you gave," he said, "but that was your ruling." He argued that the government's decision to "try to get this jury to do something contrary to what this Court did," was emblematic of a "pattern of misconduct" that had permeated the trial. Counsel for the other defendants voiced similar concerns. The prosecutor responded that he was "merely showing the jury that [the defendants'] theory [was] not one supported by the facts at hand." And in his view, he reiterated, the theory of defense was not the law. The court took the motions for mistrial under advisement. After two days of deliberation, the jury convicted each of the five defendants on all counts.

### D.    Post-Trial Hearing and Sentencing

Following the trial, the defendants moved for judgments of acquittal, and the district court convened a hearing to take up the post-trial motions. In reference to the motions for mistrial, the court expressed at the hearing that, in hindsight, it "should have sustained [the defense's] original objection instead of overruling it" and "should have maybe given a more forceful instruction to the jury including rereading the theory of defense instruction." The court questioned the propriety of the government's argument and noted the magnitude of the harm it likely caused.

THE COURT: [H]ere's my problem . . . . Constantly through[out] the trial . . . , the Court tells the jurors, listen, at the end of the trial, I am going to give you instructions, and this is the law that you are to follow. Essentially what [the prosecutor] did was to negate every time I said that. He basically said, just don't worry your pretty little heads about that instruction.

The prosecution insisted that its closing argument essentially aligned with the court's directions at the charge conference that the theory of defense was not a legal instruction. The court countered that what is said between the parties and the court when "hammering out an instruction" is quite different than what can be properly argued to the jury based on the court's final ruling.

Nevertheless, the court denied the defendants' motion for a mistrial. It found that the defendants were entitled to a theory-of-defense instruction, and that "the Government . . . chose an improper path" in its closing argument. But the court also stated that it could not find support for the proposition that a theory-of-defense instruction is the law. For that reason, the court denied the defendants' motion.

The court, however, granted judgments of acquittal to Wheeler and Long, holding that the government did not prove that those defendants knew about the overarching scheme orchestrated by Sizer and Mesa to misappropriate investors' money. As to the remaining three defendants, the district court denied their motions for judgment of acquittal.

At sentencing, the Presentence Investigation Reports (PSI) held Smigrod and Sgarro responsible for a loss of $22,278,000 and Topping responsible for a loss of $22,456,186. Sgarro's PSI applied a two-level enhancement for the use of sophisticated means during the offense. Topping's PSI included a three-level enhancement for acting as a manager or supervisor. All three defendants had a criminal history category of I. The district court sentenced each of them to a prison term: 48 months for Smigrod, 116 months for Sgarro, and 113 months for Topping. The court also ordered those three defendants to serve a three-year term of supervised release and to pay restitution.

## II.    Discussion

On appeal, Smigrod, Sgarro, and Topping argue that there was insufficient evidence to support a number of their convictions. The government cross-appeals the judgments of acquittal as to Wheeler and Long, arguing that the guilty verdicts should be reinstated because they were supported by sufficient evidence. The defendants argue that even if sufficient evidence supported their convictions, the district court should have granted a mistrial because the prosecution engaged in misconduct. Sgarro and Topping also appeal a handful of other issues related to evidentiary and sentencing rulings, as well as the jury instructions.

In the following sections, we will address: (1) the sufficiency of the evidence, (2) the defendants' allegations of prosecutorial misconduct, (3) the district court's evidentiary rulings and the jury instructions; and (4) the district court's sentencing determinations.

When considering the sufficiency of the evidence, we review de novo both the grant and denial of a judgment of acquittal, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in its favor. *Butcher v. United States*, 368 F.3d 1290, 1297 (11th Cir. 2004); *United States v. Capers*, 708 F.3d 1286, 1296 (11th Cir. 2013). We will not overturn the jury verdict "if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *Capers*, 708 F.3d at 1296. When reviewing allegations of prosecutorial misconduct in closing argument, our review is de novo. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006). We review for abuse of discretion a district court's evidentiary rulings. *United States v. Williford*, 764 F.2d 1493, 1497 (11th Cir. 1985). And in reviewing a district court's application of the Sentencing Guidelines, "we review purely legal questions de novo, and the district court's factual findings for clear error." *United States v. Monzo*, 852 F.3d 1343, 1348 (11th Cir. 2017).

### A.    Sufficiency of the Evidence

This appeal requires us to determine whether sufficient evidence supported both the conspiracy and substantive counts of mail and wire fraud as to the five defendants. To prove a conspiracy to commit mail and wire fraud under 18 U.S.C. § 1349, the government must prove that: "(1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it." *United States v. Moran*, 778 F.3d 942, 960 (11th Cir. 2015).

17-15003                 Opinion of the Court                      23

As to substantive mail and wire fraud, the government must prove that a person: "(1) intentionally participate[d] in a scheme or artifice to defraud another of money or property, and (2) use[d] or 'cause[d]' the use of the mails or wires for the purpose of executing the scheme or artifice." *United States v. Langford*, 647 F.3d 1309, 1320 (11th Cir. 2011). To prove that a defendant had the intent to defraud, the Government has to prove that the defendants either knew they were making false representations or acted with "reckless indifference to the truth." *See United States v. Simon*, 839 F.2d 1461, 1466, 1470 (11th Cir. 1988).

We have explained that the government must prove not only that the defendants had the intent to *deceive*, but also that they intended to *harm* the victim, meaning that they intended to deceive the victim about something that affected the value of the bargain. *Takhalov*, 827 F.3d at 1313. A defendant can do this in two ways: (1) lying about the price; or (2) lying about the characteristics of the good. *Id.* at 1313–14. However, if a defendant lies and says, for example, "that he is the long-lost cousin of a prospective buyer—then he has not . . . 'schemed to defraud'" because that misrepresentation does not go to the value of the bargain. *Id.* at 1314.

*Takhalov* used two hypotheticals to draw the key distinction between deceptions that do not affect the value of the bargain and those that do:

> Consider the following two scenarios. In the first, a man wants to exchange a dollar into four

quarters without going to the bank.  He calls his neighbor on his cell phone and says that his child is very ill.  His neighbor runs over, and when she arrives he asks her to make change for him.  She agrees; the quarters pass to the man; the dollar passes to the woman; and they part ways.  She later learns that the child was just fine all along.  The second scenario is identical to the first, except that instead of giving the woman a true dollar, he gives her a counterfeit one.

The first scenario is not wire fraud; the second one is.  Although the transaction would not have occurred but-for the lie in the first scenario—the woman would have remained home except for the phony sickness—the man nevertheless did not intend to deprive the woman of something of value by trick, deceit, and so on.  But in the second scenario he did intend to do so.

*Id.* at 1313 (footnote, citation, and quotation marks omitted and alteration adopted).  So to prove substantive mail and wire fraud, the government must prove more than deceit; it must prove that the defendant intended to deprive the victim of something of value. *Id.*

### 1.    Wheeler's and Long's Convictions

We discuss first the government's appeal as to the sufficiency of the evidence supporting the convictions of Wheeler and Long.  The indictment charged Long under Counts 11 (FCF conspiracy) and 12 (substantive mail fraud involving the sale of FCF stock to an investor identified as R.L.), and it charged Wheeler

under Counts 1 (Sanomedics conspiracy), 11 (FCF conspiracy) and 13 (substantive mail fraud involving the sale of FCF stock to an investor identified as B.M.).

### a.    Substantive Counts

On the substantive counts—Count 12 against Long and Count 13 against Wheeler—the district court found that the government did not prove the defendants' intent to defraud investors. On appeal, the government points to evidence that Wheeler and Long lied about their employer, lied about their compensation structure, and misled investors about the value of the stock they were selling. After a thorough review of the record, we agree with the government.

It is true that some of the misrepresentations Wheeler and Long made to investors were not the type of fraudulent misrepresentations that *Takhalov* requires the government to prove. Take, for example, the claims that Wheeler and Long were employees of the company they were pitching, or that Wheeler's name was "Matt Williams." Like pretending to be the victim's long-lost cousin or feigning the illness of one's child, these deceptions would not affect the price or characteristics of the good being sold. *See Takhalov*, 827 F.3d at 1313–14. Therefore, neither the salesperson's employment status nor his use of an alias would amount to a scheme to defraud.

There is evidence in the record, however, of Wheeler and Long making misrepresentations or failing to disclose information

that a reasonable jury could find affected the nature of the bargain. Both Wheeler and Long misled investors to believe that FCF had made millions of dollars in profit and was closely associated with high-profile companies and executives.  Long told investors that Apple was a partner with FCF and that John Sculley, a renowned CEO, was involved in the company.  Wheeler similarly told investors, including B.M., that Sculley was closely involved in FCF. Wheeler and Long also misrepresented their form of compensation, telling investors that they were paid only in company stock and did not make commissions on stock sales.  The investors' money, they said, would go back into the company.  Finally, Long misled investor R.L. to believe that FCF would be listed on the NASDAQ stock exchange and "would be going public."

A reasonable jury could infer that facts like FCF's profits, its association with a famous executive and a globally recognized technology company, and a potential listing on a major stock exchange are essential characteristics of the stock that would alter the nature of the bargain.  *See id.* at 1313–14.  The same is true of the defendants' misrepresentations about commissions.  Although investors presumably knew the salespeople were being paid somehow (and there was testimony to that effect), a reasonable jury could have found that it would decrease the value investors got from the bargain if their money was going to a salesperson's pocket in the form of commissions, rather than injecting capital for FCF to expand or to conduct research and development.  *See Simon*, 839 F.2d at 1468

(salesperson falsely telling client she did not work for commissions provided support for jury's finding of intent to defraud).

And a reasonable jury could have inferred that Wheeler and Long made these misrepresentations knowingly, or, at a minimum, with "reckless indifference to the truth." *Id.* at 1470. Notably, at least some of the defendants' misrepresentations went beyond the information contained in scripts and press releases. For example, a press release from Houlihan touted a connection between Sculley and Sanomedics based on a small investment that a Sculley-owned company made in Sanomedics. But there were no press releases connecting Sculley—or Apple for that matter—to FCF. Further, there was evidence that the salespeople filled out their own commission sheets to claim their share of each stock sale and thus would have known they were paid in commissions.

The evidence against Long on Count 12 and against Wheeler on Count 13 was not overwhelming. But considering the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in the government's favor, the evidence provided a basis for a reasonable jury to conclude that Wheeler and Long schemed to defraud investors.

### b.    Conspiracy Counts

The district court also granted judgment of acquittal on the conspiracy charges against Wheeler and Long, finding that even if they made some misrepresentations to investors, they did not know about the "overarching fraudulent scheme" perpetrated by

Mesa and Sizer to make off with investors' money.  The government argues on appeal that no such knowledge is necessary to prove a conspiracy to defraud.  Wheeler and Long, defending the district court's ruling, point us to several cases.  In *United States v. Toler*, for example, we said that the "government must show an 'interdependence' among the alleged co-conspirators in order to prove that the indicted conspiracy was a single unified conspiracy as opposed to a series of smaller, uncoordinated conspiracies."  144 F.3d 1423, 1426 (11th Cir. 1998).

We articulated a similar rule in *United States v. Chandler*, 376 F.3d 1303 (11th Cir. 2004).  There, the defendants were charged in a two-part mail fraud conspiracy.  *Id.* at 1306.  The "scheme was a classic 'hub-and-spoke' conspiracy, in which a central core of conspirators recruits separate groups of co-conspirators to carry out the various functions of the illegal enterprise."  *Id.* at 1316.  Part one of the conspiracy involved a single actor embezzling promotional game stamps from McDonald's Corporation.  *Id.* at 1306.  In part two of the conspiracy, the embezzler would give the stamps to his friends and family—the defendants—to redeem them.  *Id.*  A jury found the defendants guilty of conspiracy to commit mail fraud, and the district court denied their motions for judgment of acquittal.  *Id.* at 1305.

We reversed the denial of those motions on appeal and vacated the convictions.  Although the defendants made misrepresentations to McDonald's in redeeming the game stamps, we stressed that the indictment alleged a *single* conspiracy to accomplish two

objectives: (1) embezzle game stamps and (2) redeem those stamps. *Id.* at 1318.  The defendants agreed to help with the second objective, but—fatal to the government's case—there was no evidence that the defendants knew the game stamps had been embezzled. *Id.*  "[W]ithout proof of some *connection*" between the two objectives, we said, the government had not proved the single conspiracy it alleged in the indictment.  *Id.*

In reaching this conclusion, the *Chandler* court found persuasive the Third Circuit's decision in *United States v. Pearlstein*, 576 F.2d 531 (3d Cir. 1978).  There, the defendants were salespeople who allegedly used aliases and made misleading statements in their sales pitches to customers.  The salespeople generally used a script developed by higher-ups in the organization but sometimes "added a few exaggerations and misstatements" of their own.  *Id.* at 539.  The Third Circuit reversed the defendants' convictions for conspiracy and substantive mail fraud, reasoning that "although the defendants might have made fraudulent misrepresentations during the course of their individual sales presentations, the jury could not reasonably infer that the salesmen knew of the fraudulent purpose of the overall [fraudulent] scheme."  *Id.* at 545.

Wheeler and Long argue that, just like in those cases, the government failed to prove that they knew about the "top to bottom" conspiracy alleged in the indictment, which centered on Sizer and Mesa pocketing most of the investors' money.  Long points to testimony from Houlihan that Sizer operated "in a secretive manner," and argues that even if salespeople made some

misrepresentations to induce sales on the front end, they thought the companies were legitimate and there was no evidence whatsoever that they knew Sizer and Mesa were looting most of the money on the back end.

The government, on the other hand, points us to *Simon*, where we recognized *Pearlstein* as "persuasive" but distinguished it on the basis that the *Simon* defendants' individual misrepresentations were related to the overall scheme charged in the indictment. *Simon*, 839 F.2d at 1468. Unlike in *Pearlstein*, the jury's verdict in *Simon* was supported by sufficient evidence that the defendants knew about the alleged scheme and conspired to execute it. *Id.*

Harmonizing the cases cited by the defendants and the government, we can derive the following rule: to prove that a defendant was part of a conspiracy, there must be some evidence that the defendant knew the objective of the conspiracy charged in the indictment and decided to join it. In this case, there was sufficient evidence to support a finding that Wheeler and Long knew about a conspiracy to sell stock by lying to investors; but there was little to no evidence that Wheeler and Long knew about a plot by Sizer and Mesa to misappropriate a large percentage of investor funds for themselves. So the core issue here is: which of those conspiracies did the indictment charge?

To make that determination, we start with the language of the indictment. Count 11 described the purpose of the FCF conspiracy as follows: for the defendants to "unlawfully enrich

themselves by misappropriating investor money for their personal use and benefit" through misrepresentations and failing to disclose material facts, including "the safety and profitability of Fun Cool Free stock, and the defendants['] and their co-conspirators' excessive commissions and fees." Count 1 alleged that the Sanomedics conspiracy had a parallel purpose.

This language is not limited to a higher-level conspiracy by Sizer and Mesa to pocket investments; it matches the conspiracies that the government attempted to prove at trial in which salespeople made misrepresentations and concealed their excessive commissions to sell stock. As a result, the government could prove that the defendants knew about the conspiracy charged in the indictment without proving that they knew what Sizer and Mesa were up to.

There was sufficient evidence on which the jury could have concluded that the government did so. One way for the government to show that a defendant knew about and joined the charged conspiracy is "through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy." *United States v. Gonzalez*, 834 F.3d 1206, 1215 (11th Cir. 2016). As detailed above in reference to the substantive mail fraud counts, there is evidence that Wheeler and Long made claims they knew were false in order to further the purpose of the FCF conspiracy. Even if they did not know the extent of the fraud perpetrated by Sizer and Mesa, the jury could infer from the defendants' actions that they joined the FCF conspiracy charged in

the indictment.    Therefore, sufficient evidence supported Wheeler's and Long's convictions on Count 11.

The same can be said of Wheeler's involvement in the Sanomedics conspiracy charged in Count 1.  While selling Sanomedics stock, Wheeler made many of the same misrepresentations he made while selling FCF stock.  There was also testimony that he concealed from investors that they would be indefinitely restricted from selling their Sanomedics stock.[5]  Therefore, there was evidence to support a finding that Wheeler knew about and joined the conspiracy to defraud investors in Sanomedics.

Because there was evidence to support the jury's verdict on the substantive and conspiracy counts against Wheeler and Long, we reverse the district court's judgment of acquittal as to those defendants.  We turn next to the convictions of their three co-defendants.

### 2.    Smigrod's, Sgarro's, and Topping's Convictions

Counts 1 and 11 of the indictment charged Smigrod with the Sanomedics and FCF conspiracies, and Count 9 charged him with

---

[5] Unbeknownst to the investors, they were not buying shares directly from Sanomedics; they were buying Sizer's personal shares which were restricted. Juan Perez Ortega, a salesperson who worked in the Florida phone room, testified that Wheeler knew about the stock restriction but did not disclose it to investors, which provides support for the inference that Wheeler knew about the conspiracy to defraud investors.

substantive mail fraud based on a July 2014 sale of Sanomedics stock to an investor identified as D.M. Sgarro was charged in the Sanomedics conspiracy in Count 1 and for substantive mail fraud involving investors identified as G.S. and A.O. in Counts 2 and 10.[6] Notably, she left Sanomedics in 2011; but on her way out, she referred clients—including G.S. and A.O—to Sizer, who sold them additional shares. Finally, the indictment charged Topping in both the Sanomedics and FCF conspiracies and in a slew of substantive counts. Altogether, he was charged in Counts 1, 2, 3, 6, 7, 8, 9, 10, 11, and 13. We first consider the defendants' substantive convictions and then turn to the conspiracy convictions.

### a.    Substantive Counts

Beginning with Smigrod, he says that he lacked any intent to defraud investors. First, he argues that his misrepresentations were minor and did not go to the nature of the bargain. Second, he argues that the government did not prove that he knew the statements he made were inaccurate. We find, however, that although the evidence against Smigrod was not overwhelming, it was sufficient to support the jury's guilty verdict. Like Wheeler and Long, Smigrod hid from investors that he made commissions as high as twenty percent. There was also testimony from one of Smigrod's co-workers that he knew the Sanomedics stock he sold was restricted, yet he failed to disclose the restriction to investors.

---

[6] Sgarro was also charged and convicted on Count 1, but she does not appear to challenge the sufficiency of the evidence supporting that conviction.

Based on these facts, it is at least a "reasonable construction of the evidence" that Smigrod intended to defraud victims by deceiving them about the value of Sanomedics stock. *Capers*, 708 F.3d at 1297.

As to Sgarro, she argues that she did not participate in the stock sales to G.S. and A.O. that are charged in Counts 2 and 10. Regarding Count 2, Sgarro first sold stock to G.S. in early 2010. Later, in 2011, G.S. bought additional shares from Sizer which form the basis for Count 2. Sgarro argues that she cannot be liable for the 2011 transaction because she was no longer in the organization and did not participate in that sale. She also stresses that she tried to dissuade G.S. from buying more Sanomedics stock, pointing to testimony that she told him he already had enough.

We disagree. As the government explains, there was sufficient evidence that Sgarro aided and abetted the transaction in two ways, even if she did not personally participate. First, she provided Sizer with G.S.'s contact information, and there was sufficient evidence to allow the jury to infer that she did so knowing Sizer would defraud G.S. Second, she told G.S. that if he reported her to the authorities, she would deny everything. We have held that discouraging a victim from going to the authorities amounts to aiding and abetting the crime. *United States v. Hansen*, 262 F.3d 1217, 1236 (11th Cir. 2001) (per curiam).

On Count 10, Sgarro was convicted of defrauding investor A.O. That investor testified that Sgarro called her and presented an investment opportunity in Sanomedics stock. Sgarro told A.O.

that Sanomedics was going to secure an endorsement deal with Cesar Millan, a popular television personality known as the "dog whisperer," and that Sanomedics had recently received two large orders that would generate over $10,000,000 in revenue. She also said that Sanomedics was in clinical trials at Yale Medical School and Miami Children's Hospital. None of these representations were true.

A.O. invested $100,000 in Sanomedics stock with Sgarro. When Sgarro left the operation in early 2012, she referred A.O. to Sizer, and A.O. continued to invest in Sanomedics with Sizer in the summer of 2012. Although Sgarro did not personally orchestrate the 2012 transaction on which Count 10 is based, A.O. testified that she executed that transaction based on "the viability of the corporation as told to me by Anita [Sgarro] and Craig Sizer." Specifically, A.O. testified that she relied on Sgarro's representations that Sanomedics was in clinical trials, that it had high-profile endorsements, and that it was making millions in profit. While Sgarro argues that people typically make stock purchase decisions based on currently available information, we cannot substitute our judgment for that of the jury, who apparently credited A.O.'s testimony about her reliance on Sgarro's earlier representations. Therefore, we reject Sgarro's sufficiency-of-the-evidence argument.

Finally, Topping's substantive convictions. Topping's primary argument is that there was no basis on which the jury could have convicted him of Counts 2, 6, and 10 because there was no evidence that he was involved in those transactions or that he had

any contact with the victims named in those counts.  We rejected a similar argument in *United States v. Munoz*, 430 F.3d 1357, 1368–69 (11th Cir. 2005).  There, we held that a defendant can be guilty of mail fraud even if there is no evidence of his personal interaction with a particular victim.  It is enough to show that the defendant "participated in a scheme to defraud all buyers."  *Id.*; *see also United States v. Toney*, 598 F.2d 1349, 1355 (5th Cir. 1979) ("It is well settled in this circuit that so long as one participant in a fraudulent scheme causes a use of the mails in execution of the fraud, all other knowing participants in the scheme are legally liable for that use of the mails.").[7]  Because there was evidence that Topping actively participated in the scheme to defraud at the time of the transactions described in Counts 2, 6, and 10, the government need not show that he was personally involved with every victim.  *See Munoz*, 430 F.3d at 1368–69.

More broadly, Topping argues that there was insufficient evidence to support all of his convictions because the government failed to prove that he made misrepresentations that went to the nature of the bargain with investors.  His argument is that despite any misstatements he made, investors got the shares of stock they bargained for.  He also argues that the government failed to prove that he knew any misstatements were false.  We are satisfied,

---

[7] We adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

however, that the record provides sufficient evidence for a reasonable jury to conclude both that Topping's representations were essential to the bargain and that Topping knew they were false. True, Topping's use of an alias or his claiming to work for Sanomedics would not establish an intent to defraud. But to highlight some facts that could establish such intent, there was evidence that Topping:

- said that Sanomedics was profiting millions of dollars (its annual revenue never actually reached $100,000);

- represented that FCF was "bring[ing] on John Sculley, former Apple CEO, to facilitate success and growth"; he also played up connections with other famous people like billionaire investor Phillip Frost and the founder of Papa John's Pizza, whereas, in reality, none of these people were actively involved in Sanomedics;

- created the illusion that he was offering investors a special opportunity to buy "institutional shares," although there was nothing special about the shares he was selling; and

- concealed that he made commissions and that the stock he was selling would be restricted.

And the jury could have drawn the inference that Topping made these claims knowing they were false. Many of these statements went beyond the information in the written press releases, and Topping even admitted in an interview with law enforcement that he misled investors about how he was compensated. This

evidence was sufficient to support Topping's convictions on the substantive counts.

### b.    Conspiracy Counts

Smigrod and Topping also challenge the sufficiency of the evidence supporting their convictions on Count 1 (the Sanomedics conspiracy) and Count 11 (the FCF conspiracy).  Both claim that they did not know of the conspiracies to defraud investors—that they were unwitting pawns in a conspiracy hatched by Sizer and Mesa.  But, as with Wheeler and Long, there was sufficient evidence for the jury to conclude that Smigrod and Topping knowingly joined the conspiracies charged in the indictment.  Again, Smigrod's and Topping's misrepresentations often went beyond the information provided to them in scripts or press releases, allowing the inference that they invented falsehoods to further the purpose of the conspiracy.  *See Gonzalez*, 834 F.3d at 1215.  And there was additional evidence that the defendants were not innocent dupes.  For example, Mesa instructed salespeople not to pitch members of law enforcement, financial professionals, or lawyers, and there were even signs posted to that effect in the Florida phone room.  Finding that sufficient evidence supported the jury's verdicts, we affirm the district court's denial of the motions for judgment of acquittal.

### B.    Prosecutorial Misconduct

Even if the defendants are not entitled to a judgment of acquittal, we still must consider their arguments that they are entitled

to a new trial. *See United States v. Thomas*, 86 F.3d 647, 651 (7th Cir. 1996) (finding that evidence was sufficient to convict the defendants but reversing the convictions and remanding for a new trial because improper jury instructions did not amount to harmless error). We begin with the defendants' argument that the district court should have ordered a new trial because of prosecutorial misconduct.

Prosecutors have a special role in our justice system. "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). So we must carefully review accusations that a criminal conviction is marred by prosecutorial misconduct. Our two-step framework for assessing allegations of prosecutorial misconduct is well-established: "(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *See Eckhardt*, 466 F.3d at 947.

We begin with the first prong: whether the prosecutor made improper remarks. While a prosecutor can attack a defense theory during closing argument, *see United States v. Sosa*, 777 F.3d 1279, 1297 (11th Cir. 2015), he is not to misstate the law or tell the jury it can ignore the law, *see Spivey v. Head*, 207 F.3d 1263, 1275 (11th Cir. 2000).

Whether the prosecutor acted improperly here is a close question. The theory-of-defense instruction explained, crucially,

that there is a "difference between deceiving and defrauding." It is cause for concern that the prosecutor told the jury that this instruction was "not the law." When considered in context, however, we cannot say that the prosecutor's remarks were improper. The district judge repeatedly emphasized to the lawyers that the theory-of-defense instruction was *not* an instruction about the law and did *not* affect the legal elements for mail and wire fraud. When one prosecutor raised concerns that the proposed wording of the theory of defense instruction was "describing it as the law," the judge responded "[n]o, I say up front it is the defendants' theory of defense." When one defense lawyer proposed a sentence beginning "the law makes clear," the judge responded, "saying the law makes clear is not probably the best way to caption a paragraph for a theory of defense." When another complained about removing several paragraphs from his proposed instruction, the judge emphasized: "I think you have a right to say what your theory is, not a right to, through the theory, back door the instruction" on intent to harm. She went on to admonish them: "I don't want the jury to think this is part of the actual substantive instruction." As she edited the instruction, she underscored that she was "trying to take out anything that says the law requires or this requires."

Moreover, that the prosecutor confusingly characterized the theory-of-defense instruction does not necessarily mean that the prosecutor acted improperly. One of our precedents, in particular, underscores this point. In *United States v. Chirinos*, 112 F.3d 1089 (11th Cir. 1997), we held that a prosecutor did not commit

misconduct when he discussed during his opening statement "highly prejudicial evidence" of a defendant's unrelated criminal activity. *Id.* at 1097. Even though the district court later excluded that evidence, we did not fault the prosecutor for making the remarks. These remarks were "not improper," we reasoned, because the prosecutor thought "the district court would admit the 404(b) evidence at the time he made such statements." *Id.* at 1098. The same is true here: based on the district judge's statements during the charge conference, the prosecutor could reasonably have believed his remarks were proper. And the district judge even agreed the remarks were proper in overruling the defendants' first objection. Accordingly, we find that the prosecutor did not make improper remarks and thus we need not consider whether the comments were prejudicial. *See Eckhardt*, 466 F.3d at 947.

## C.    Evidentiary Issues and Right to Unanimous Verdict

We turn next to the defendants' contentions that the district court abused its discretion by allowing inadmissible evidence at trial in several instances, and Topping's contention that the jury instructions deprived him of his right to a unanimous jury verdict.

Beginning with the evidentiary issues, Topping argues, first, that the district court erred by allowing Rubens, a government informant who secretly recorded the Florida phone room, to offer improper lay opinions. Rubens testified that the Florida phone room was a "boiler room"—a term used to describe a salesroom that uses high-pressure selling tactics. Rubens also identified and defined the roles that were commonly assigned to salespeople in

boiler-room operations. For example, front-end salespeople who cold-called potential investors were called "fronters." After a fronter made a sale, a second salesperson, known as a "loader," would follow up and pitch the investor on making additional purchases.

The district court did not abuse its discretion in allowing Rubens's testimony. Under the rules of evidence, a lay witness can give opinion testimony that is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Rubens's testimony met these criteria. He was able to assist the jury by explaining, for example, some of the jargon used in conversations between Rubens and Mesa. And Rubens was able to draw on his own experience in the field to explain to the jury how "boiler rooms" typically functioned, as well as the various roles that salespeople played in such operations. Because Rubens's testimony was based on his own perceptions, was helpful to the jury, and was not based on scientific or technical knowledge, Rubens did not give an improper lay opinion. See Fed. R. Evid. 701.

Next, Topping argues that the district court allowed inflammatory victim impact testimony. To prove mail fraud, the Government does not need to prove that the victims suffered an actual loss. As a result, Topping argues, the court erred by allowed victims to testify about the amount of their loss, and—even worse—

the impact of that loss, such as victims struggling to pay for their child's surgery or for their grandson's college. We find, however, that the testimony at issue came into evidence to illustrate that the defendants would learn about the victims' personal lives, gain their trust, and then use that trust to exploit them. And, in any event, the district court gave a limiting instruction, stressing that the jury could not "be influenced in any way by either sympathy for or prejudice against the defendant." As a result, we do not find reversible error based on the victims' testimony.

Finally, both Topping and Sgarro argue that the district court abused its discretion when it allowed the government to improperly impeach defense witness Gary Miller on a collateral matter in order to label Sgarro as a drug dealer. Although this is a close question, we cannot say that the district court abused its discretion in this regard. "[E]xtrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). However, extrinsic evidence can be "offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity)." Fed. R. Evid. 608(b), advisory committee's notes to 2003 amendments. Typically, extrinsic evidence of a prior inconsistent statement is admissible because it is relevant to the witness's character for untruthfulness, but the witness must be given "an opportunity to explain or deny the statement," and an adverse party must be given "an opportunity to examine the witness about it." Fed. R. Evid. 613(b).

We have held, however, that the Government cannot begin a line of questioning that is irrelevant, only to impeach the witness with a prior inconsistent statement. In *United States v. Reed*, for example, a defendant who stood trial for embezzlement and obstruction of the mail testified in his own defense. 700 F.2d 638, 643 (11th Cir. 1983). During cross-examination, the prosecution asked whether the defendant had admitted to investigators that he smokes marijuana. *Id.* After the defendant denied making the statement, the prosecution called the investigator in rebuttal to impeach the defendant with a prior inconsistent statement. *Id.* at 644.

We reversed the defendant's conviction in *Reed* because irrelevant references to the defendant's drug use amounted to prejudicial error. *Id.* at 646–47. We explained:

> Though the defendant's answers may have indeed been false, the issue before us is the propriety of the prosecutor's questions and the introduction of the defendant's possession and use of marijuana as an issue in the trial; the prosecutor can hardly contend that his question was intended to highlight a prior inconsistent statement when no inconsistent statement had been uttered until after the prosecutor broached the marijuana issue.

*Id.* at 644. Sgarro urges that the same result should follow here.

Although this case bears some similarity to *Reed*, the government points out a key distinction. In this case—unlike in

*Reed*—the prosecution's initial line of questioning was relevant to establish that the witness might be biased.  If Miller had an illicit drug-dealing business with Sgarro, he might have been likely to slant his testimony in her favor.

In that regard, this case is analogous to *United States v. Abel*, 469 U.S. 45 (1984).  There, the prosecution pursued a line of questioning related to the defense witness and the defendant having membership in a secret prison gang.  When the defense witness denied that association, the prosecution used extrinsic evidence to impeach him.  The prosecution's line of questioning was relevant, the Court held, to establishing that the defense witness might be biased in the defendant's favor based on shared membership in the gang.

Here, the district court, in its discretion, found that the prosecution's inquiry was relevant to illustrate Miller's bias, rather than simply to portray Sgarro as a drug dealer.  In light of the Supreme Court's decision in *Abel*, the district court did not abuse its discretion in admitting this evidence.

Having addressed the defendants' contentions that the district court's evidentiary rulings were an abuse of discretion, we turn to Topping's argument that the district court erred in its jury instructions.  Topping argues that the jury instructions were erroneous because they charged "overlapping," rather than separate conspiracies.  Because the conspiracies were presented to the jury as overlapping, the argument goes, the jury could convict as long as each juror believed Topping was guilty as to *one* conspiracy.

Such a result would run afoul of the principle that a jury cannot convict without a unanimous finding of guilt as to a single conspiracy. *See Richardson v. United States*, 526 U.S. 813 (1999).

After reviewing the jury instructions at issue here, we reject Topping's argument. As the government points out, the instructions conveyed that conspiracies were "overlapping" in the sense that the *participants* overlapped. The instructions read: "As you can see, the Indictment alleges two overlapping conspiracies. Please note that Defendant Long is not charged in Count 1, which is the first conspiracy count, and Defendant Sgarro is not charged in Count 11, the other conspiracy count."

Moreover, the jury instructions directed the jury not to lump together separate charges. In relevant part, the instructions provided that:

> Each count of the indictment charges a separate crime against one or more of the defendants. You must consider each crime and the evidence relating to it separately. And you must consider the case of each defendant separately and individually. If you find a defendant guilty of one crime, that must not affect your verdict for any other crime or any other defendant.

Because the jury instructions explained that each crime was to be considered separately, they did not deprive Topping (or any defendant) of the right to a unanimous jury verdict.

### D.    Sentencing

Having determined that the defendants' convictions should be affirmed, we turn to a number of sentencing-related issues raised by the defendants. Sgarro and Topping each argue that the court improperly applied sentencing enhancements. As to Sgarro, she argues that the court should not have applied the sophisticated-means enhancement because there was nothing intricate or complex about the conspiracy. The Sentencing Guidelines include a two-level enhancement for an offense that involved sophisticated means. U.S.S.G. § 2B1.1(b)(10)(C). An offense is sophisticated if it involves "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* § 2B1.1, application notes 9(B). We have held that a sophisticated-means enhancement can be applied when some—but not all—aspects of a scheme are sophisticated. *See United States v. Ghertler*, 605 F.3d 1256, 1267–68 (11th Cir. 2010). Here, parts of the Sanomedics scheme were sophisticated. For example, the evidence showed that Sgarro paid her salespeople through a company not associated with Sanomedics: Ladybug Ventures. Sgarro also had her salespeople research target investors' financial assets, sometimes rewarding salespeople for finding investors with IRA accounts. Based on this evidence, the district court's application of

the sophisticated-means enhancement was not clearly erroneous. *See Monzo*, 852 F.3d at 1348.

As to Topping, he argues that the court had no basis to impose a managerial-role sentencing enhancement. The Sentencing Guidelines include a three-level enhancement for acting as "a manager or supervisor." *Id.* § 3B1.1(b). Even if a defendant could not force others to engage in criminal conduct, he can still be sentenced as a manager or supervisor if he hires and trains others to participate in the criminal operation. *United States v. Matthews*, 168 F.3d 1234, 1249–50 (11th Cir. 1999). Here, there was evidence that Topping led sales meetings and trained new salespeople, and he was the only one in the Florida operation with an office, other than Mesa (the director of the Florida operation). Accordingly, the district court did not clearly err in applying a sentencing enhancement for Topping's managerial role. *See Monzo*, 852 F.3d at 1348.

Sgarro and Topping also contest the amount of loss for which they were held responsible. Sgarro argues that, because she worked only in the California operation and because she left the conspiracy in early 2011, the district court erred in attributing to her a $22.3 million loss, which represented victims' losses from both the Florida and California operations. Similarly, Topping argues that the evidence does not support the $22.5 million loss attributed to him. He argues that the district court did not even attempt to make an individualized finding as to the extent of his culpability.

We do not find these arguments persuasive. The district court need only make a reasonable estimate of the loss. *United States v. Campbell*, 765 F.3d 1291, 1301 (11th Cir. 2014). And as the government notes, a defendant is liable for the total loss amount of the conspiracy when she is actively involved in furthering the conspiracy's overall objective. *United States v. McCrimmon*, 362 F.3d 725, 731–33 (11th Cir. 2004). Here, there was evidence that Sgarro knew the overall scheme and actively participated in furthering it. The following two facts, among others, support that conclusion. First, Sgarro was in close contact with Mesa and the Miami phone room, often exchanging information about sales and investor financial information. Second, she introduced investors to Sizer, who oversaw both the Florida and California operations. Therefore, the district court did not err in holding Sgarro accountable for losses caused by the Florida and California phone rooms. Likewise, because Topping actively participated in the scheme to defraud, he is liable for the amount of loss to all the victims who were defrauded through the scheme. *See id.*

In conclusion, we affirm the convictions and sentences of Smigrod, Sgarro, and Topping. As to Wheeler and Long, we reverse their judgments of acquittal and remand to the district court for proceedings consistent with this opinion.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**

WILSON, Circuit Judge, joined by LAGOA, Circuit Judge, concurring:

I concur in the court's judgment. I write separately to express my concern with the conduct of the prosecution during closing argument and throughout trial in this case.

To address what transpired in closing argument, the theory-of-defense instruction drafted by the district court was quite unusual. It framed statements of law as the defendants' "conten[tions]." And, as the court's opinion explains, the district judge told the parties during a charge conference that the instruction in question was "a theory, not a legal instruction." Perhaps the prosecutor still should have known better than to argue that an instruction from the court was "not the law." It is well-settled that district courts can instruct the jury on a theory of defense only if it is based on a correct statement of law. *See Chirinos*, 112 F.3d at 1101 ("The district court should instruct the jury on the defendant's defense theory if the theory has a foundation in evidence and legal support."). As the district court correctly told the parties, the prosecution should have focused its argument on whether the theory of defense "match[ed] up to the evidence"—not whether the instruction accurately stated the law. Still, the district court's commentary on the instruction, as well as the manner in which the instruction was phrased, gave mixed messages. With that in mind, I cannot say that the prosecution's closing argument amounted to prejudicial misconduct under our precedents.

More broadly, however, I feel compelled to address the prosecution's conduct and the tactics it employed throughout the trial. The prosecution fell short of the high level of professionalism that we expect prosecutors to embody, even if their actions did not rise to the level of misconduct. An unfortunate but notable feature of this trial was that the district court exerted considerable time and energy corralling the prosecution's often wayward tactics. Starting in voir dire and continuing through the testimony of multiple witnesses, the prosecution frequently appeared to ignore the court's rulings when it disagreed with them, eliciting remarks from the court including:

- "Counsel, you know that's improper."

- "[W]hy would you go there?"

- "We went over this. . . . I may be wrong, but I ruled. Let's go."

- "We've had this conversation through other witnesses. Counsel, move on."

- "We did this yesterday. I'm not revisiting. Anybody [who] wants to go back to the transcript, can."

- "I don't know . . . how many other languages to speak to you. . . . I said how to proceed. Proceed that way."

- "What you have to do is to remember we have had some rules in this trial and somehow they seem to have been forgotten."

The court's admonitions, it seems, had little effect. After a particularly volatile exchange between a prosecutor and defense witness Miller, in which the prosecutor admitted that he lost his composure, the district court warned that he was "close" to causing a mistrial. Afterward, outside the presence of the jury, she admonished the prosecutor, telling him: "You're better than having to go to the lowest part of your anger in order to examine this witness. . . . [Y]ou're an experienced cross-examiner. You didn't have to do that. I would have expected that of someone of less experience than you." The district court lamented that things "got very messy and uncontrolled."

Certainly, some missteps are to be expected over the course of a long, contentious trial. And to be sure, the court felt compelled on occasion to correct the conduct of the defense lawyers, as well as the prosecution. A review of the transcript, however, leaves no doubt that the prosecution's professionalism and demeanor was particularly lacking. The district court, after having had time to reflect, singled out one prosecutor's conduct at trial as "disturbing" and recounted multiple instances in which he came "so close" to causing a mistrial.

Prosecutors must hold themselves to a higher standard. As they carry out their duty to seek justice, they must strive to conduct themselves with the utmost professionalism, "even when the ethical rules and constitutional requirements do not bar the behavior" in question. See Charles R. Wilson, "That Justice Shall Be Done"— Constitutional Requirements, Ethical Rules, and the Professional

17-15003                Opinion of the Court                53

*Ideal of Federal Prosecution*, 36 N. Ill. U. L. Rev. 111, 135 (2015).
Although the prosecution's actions in this case did not amount to
misconduct under our precedents and on the unique facts pre-
sented here, I expect far better from prosecutors in future cases.